WATTS *v.* EVANSVILLE, MT. CARMEL AND NORTHERN RAILWAY COMPANY ET AL.

[No. 23,893. Filed January 3, 1921. Rehearing denied June 24, 1921.]

1. APPEALS.—*Separate Appeals.*—*Statutes.*—While §667 Burns 1914, Acts 1903 p. 338, §7, provides a simple method whereby any party other than the appellant may have incorporated in the transcript any part of the record which is not required by appellant's praecipe, appellees may, instead of filing cross-errors, take a separate appeal. p. 42.

2. WATERS AND WATER COURSES.—*Surface Water.*—*Obstructing Flow.*—Water running over land outside of and apart from

any natural or artificial watercourse is surface water, against which a lower proprietor may dam to prevent it from entering on his land, and he cannot be held liable for damages from the accumulation of water above the obstruction or because such obstruction causes the water to flow into the lands of another to his damage.  p. 44.

3. WATERS AND WATER COURSES.— *Surface Water.— Natural Flow.—Collection into Channel.—Liability.*—The owner of land is not liable for damages to the lands of another occasioned by the surface water flowing therefrom as it naturally flows over the surface of the ground, but he may not collect the surface water into a channel and cast it onto the lands of a lower proprietor, either intentionally or negligently, without incurring a liability for the damages caused thereby.  p. 44.

4. WATERS AND WATER COURSES.—*Surface Water.—Right to Obstruct.—Waters Over Lowlands Adjacent to Stream.*—The rule that a landowner may dam against surface water to prevent it from flowing upon his lands does not apply to waters flowing over the lowlands adjacent to a natural stream or watercourse as a result of high water or freshets, causing the stream to overflow its natural banks, which overflow water follows the course of the stream to its outlet or on the subsidence of the water returns to the channel.  p. 45.

5. WATER AND WATER COURSES.—*Construction of Embankments over Lowlands.—Obstruction of Water.—Liability.*—The duty is imposed upon a railroad company constructing its road across a river and adjacent lowlands subject to overflow to use ordinary care, in view of all the circumstances and conditions which were known, or which could have been known by the exercise of due care, as well as conditions which could have been reasonably forseen or anticipated, not to expose the lands of others to damage by an unnatural flow of water occasioned by the obstruction, though the railroad was not an insurer against all dangers.  pp. 46, 49.

6. RAILROADS.— *Construction Across Streams.— Duty of Company.—Statutes.*—Section 5195, cl. 5, Burns 1914, Acts 1911 p. 136, relating to the duty of railroad companies constructing roads across streams, imposes the same duty upon such companies as rested upon them at common law, the statute simply declaring the common-law rule.  p. 47.

7. NEGLIGENCE.—*Acts of God.—Liability.*—There is no remedy for an injury caused solely by an act of God, or *vis major.*  p. 50.

8. NEGLIGENCE.—*Act of God.—Concurrent Negligence.—Liability.*—Where an injury occurs as a result of negligence operating concurrently with a major force or an act of God, the

person or agency responsible for the negligence is answerable for all resulting damages, provided the negligence was a proximate concurrent cause of the resulting injury.  p. 51.

9.  WATER AND WATER COURSES.—*Obstruction of Stream.*—*Injury to Land.*—*Liability.*—In an action against railroad companies to recover for injuries to plaintiff's land, due to the obstruction of flood water, *held* that defendants were liable for damage resulting from the inadequacy of openings in embankments where defendants' railroad crossed a river and adjacent lowlands, although the damages were greatly enhanced by an unprecedented and unforeseen flood.  p. 51.

10.  NEGLIGENCE.—*Proximate Cause.*—*Act of God.*—*Concurring Cause.*—Where a railroad company constructed its road across a river and adjacent lowlands, if due care in providing against dangers which could have been reasonably anticipated would have prevented or avoided an unforeseen danger incident to a flood which actually arose and caused the injury to plaintiff's land, the negligence in failing to use such care must be regarded as the proximate cause of the injury if acting alone, and if acting in conjunction with another force, such as the act of God, it must be deemed a concurring proximate cause. p. 52.

11.  NEGLIGENCE.—*Proximate Cause.*—*Anticipation of Particular Injury.*—In determining whether an act or omission is negligence, the question depends on whether an injury of some kind to some person could reasonably have been expected to result; but, when it has been determined by an application of this principle that there has been a failure to use care by the party charged with negligence, it becomes unimportant whether the particular injury which actually occurred could have been reasonably expected to happen in the particular manner in which it occurred, for in such cases the law imposes liability for all injurious consequences which result directly and proximately from the negligence regardless of whether they might or might not have been reasonably foreseen.  p. 53.

From Gibson Circuit Court; *F. M. Hostetter,* Special Judge.

Action by Roberta G. Watts against the Evansville, Mt. Carmel and Northern Railway Company and another.  From the judgment rendered, both parties appeal.  (Transferred from the Appellate Court under §1394 Burns 1914, Acts 1901 p. 565.)  *Reversed in part and affirmed in part.*

*Arthur P. Twineham* and *Charles E. Sumner,* for appellant.

*Lucius C. Embree, W. F. Elliott, P. J. Kolb, L. J. Hackney, Frank L. Littleton* and *Morton C. Embree,* for appellees.

LAIRY, J.—This action was instituted by appellant against appellees to recover damages for injury to her real estate. The court made a special finding of facts, stated conclusions of law thereon, and rendered judgment for appellant. Both parties have appealed. Appellant filed her record under the above title and number, and assigned as error that the court erred in its fourth conclusion of law. Appellees filed their record under the title and number "The Evansville, Mt. Carmel and Northern Ry. Co., and the Cleveland, Cincinnati, Chicago and St. Louis Ry. Co., appellants, v. Roberta G. Watts, appellee; No. 9527," and each appellant therein assigned the following errors:   (1) That the court erred in overruling the separate motion of each appellant for an order requiring the appellee to separate her complaint into two or more paragraphs; (2) that the complaint does not state facts sufficient to constitute a cause of action; (3) that the court erred in overruling the separate demurrer of each appellant to the complaint; (4) that the court erred in each conclusion of law; and (5) that the court erred in overruling the separate motion of each appellant for a new trial.

The special finding is voluminous, consisting of fifty consecutively numbered items. The substance of so much thereof as is necessary to an understanding of the conclusions of law, is as follows:

From its source to the structure herein denominated the Big Four bridge the Wabash river is 432 miles in length, with an average fall per mile of 1.44 vertical

feet. The total area drained by the Wabash river and its tributaries from its source to said Big Four bridge is 27,747 square miles. The Wabash river in its stages of ordinary flow is, and at all times herein involved has been continuously, a natural stream and waterway; and from its mouth to a point many miles above the city of Mt. Carmel, Illinois, is a navigable river and a highway of commerce, both interstate and intrastate. At all points involved in this cause, said river is and always has been subject to freshets and overflows, and variances in volume and current. The record of the United States weather bureau covering the period from 1885 to 1910, inclusive, discloses that the depth of the water in the low-water channel has ranged from 8.4 feet to 27.1 feet.

In 1910 and 1911 the Evansville company constructed a line of railway from Evansville, Indiana, in a general northwesterly direction to a point about one mile southwest of the city of Mt. Carmel, Illinois, where it connects with the Cairo line. The Evansville company so located and constructed its said line that it crosses the Wabash river, extending from the highlands on the Indiana side across the lowlands subject to overflow to the highlands on the Illinois side. As a part of said inter-highland section of railway the Evansville company erected across the lowest water channel of the Wabash river a railroad bridge, which is designated herein the Big Four bridge. By reason of an abrupt curve in said channel this bridge was located at right angles with said channel. Said company also constructed and erected embankments, small bridges and trestles, which in connection with said Big Four bridge constituted said inter-highland portion of said railway. These embankments, bridges, and trestles were constructed as permanent structures for the permanent support of the way, trackage and traffic of the Evans-

ville line. The inter-highland section of said railway is 34,537 feet in length and was so constructed that 20.7 per cent. of its total linear measurement is represented by openings in the nature of bridge and trestle work, and 79.3 per cent. is represented by solid earthen embankments. The six solid earthen embankments were from twenty to twenty-four feet in width across the top, and were of various heights at different points. At the highest points they were of an altitude of twenty-three feet from the ground level, and at numerous other points they were of all heights intermediate between five and twenty-three feet. At either end of said inter-highland section said embankments for considerable distances so diminish from said five-foot height as to meet the rising ground at a level, and the sides of said embankments are constructed with slopes of 56 1/3 degrees from vertical or 33 2/3 degrees from horizontal.

Since June 25, 1906, appellant has been the owner in fee simple of certain real estate comprising part of the low ground below said inter-highland section of railroad. One tract of her said real estate is known as the Bilderback forty, and another tract as the Watts quarter section. The right of way of said inter-highland section of railroad is 200 feet in width; and the southwesterly edge thereof runs diagonally across the Bilderback forty so as to cut off and cover 1.17 acres in triangular form in the northeast corner of said tract; and said railroad has always extended longitudinally through the center of the said right of way.

The Evansville line is and has always been owned by the Evansville company. By virtue of a written contract between said parties, executed November 1, 1910, the Cleveland company became the lessee from the Evansville company of said Evansville line for a period of ninety-nine years from and after said date. The Evansville line, including the inter-highland section

thereof as above defined, prior to July 1, 1911, was continuously maintained by its original constructor, and since July 1, 1911, has been continuously maintained by the Cleveland company for the joint benefit of both of said companies under said written contract; and all without any alteration, prior to the injuries hereinafter set forth, from the form of original construction, excepting such changes as were due to ordinary repairs and upkeep.

During the month of March, 1913, a storm of rain occurred throughout the drainage area of the Wabash river and its tributaries, and in other parts of America, which storm, in respect of great precipitation in short time over vast territories, was unprecedented. As a result of said storm the Wabash river was greatly swollen. The rainfall of said storm was so distributed and timed as that the crests of the White and Patoka river floods met and converged above and at Mt. Carmel, Illinois, with the crest of the Wabash river flood, so that thereby the Wabash river flood at, above and particularly below the confluence of the White and Patoka rivers did on March 30, 1913, rise to an unusual and unexpected height, and said waters did on said day rise at and on the Mt. Carmel gauge to an unprecedented vertical height, viz., a height of 31.1 feet. The valley of the Wabash river at, near and for miles above Mt. Carmel and for miles down toward the mouth of said river was consequently submerged in water to a depth of three and one-tenth feet greater than was ever before or since known to history or tradition; and the area of such submergence from above Mt. Carmel down to the mouth of said Wabash river was consequently correspondingly and unprecedentedly increased.

When the flood waters arrived at the inter-highland section of railroad they overflowed, in varying depths.

the tops of the railway embankments, but at and near the points of the several openings of bridge and trestle work the track or top surface was not so submerged and said openings below the track were not completely filled by the passing waters, all for the reason that the water surface at and near said openings was sharply inclined downward in the direction of flow. The bridge and trestle openings, by reason of their inadequacy of size and flowage space, did not and could not in view of the embankments hereinabove described, permit a substantially free, natural and unobstructed flow of the waters and currents of the Wabash river which reached a maximum height on March 30, 1913. For several days immediately prior to and for several days immediately subsequent to March 30, 1913, the flood plane was so obstructed by said embankments that the waters and currents did not and could not flow in natural and unbroken sheet, in respect of continuity of surface plane, and the embankments so dammed said descending waters and currents back above said embankments and so retarded the flow of the descending waters to points below the embankments that the vertical height of the water surface immediately above the embankments was at times and places of maximum difference four feet greater than the vertical height of the water surface immediately below said embankment. At the several openings except the opening of the Big Four bridge and its trestle approaches, the differences in height relationships caused the waters and currents to flow through the openings in volumes and velocities greatly in excess of natural and unobstructed flowage, and with water surface much more sharply inclined downward in the direction of flow that said surface would or could have been inclined under conditions of natural and unobstructed flowage. Under and through the northwestern end of the opening designated "Sumner ditch trestle

and bridge," a large dredged public ditch, known as the Sumner ditch and draining an extensive area of territory northeast of said Evansville line since a time long prior to the construction of said Evansville line, has continuously passed *via* its present route under said railway, coming down thereto for a distance of one mile 'from a northeasterly direction. On and for several days immediately prior, and for several days immediately subsequent to March 30, 1913, the flood waters of the Wabash river crowded and flowed downstreamwards through said Sumner ditch bridge and trestle openings, and were precipitated through said openings in torrential volumes and velocities, with concentrated force and with sharp descent and incline of surface plane downward in the direction of flow, all to an extent highly material to the consideration of this cause. Said conditions were wholly foreign to and different from conditions of natural and unobstructed flowage at and in the neighborhood of said opening, and were a proximate result of the insufficiency of all the openings in these special findings described, to allow a substantially free and natural passage of said waters. During the days last above indicated, the torrents at said openings by reason of said volumes, velocities, force and inclines of surface plane so operated as to scour, gouge out, and excavate at and about said opening at said Sumner ditch crossing a hole in the ground 200 feet in width by 300 feet in length and with a maximum depth below ground surface of twenty-eight feet; and to cast, scatter and distribute a vast tonnage of earth, sand, fine gravel and coarse gravel so washed out from said hole and from the site thereof, over the twenty acres comprising the southern half of the Bilderback forty. At a point one-quarter of a mile westward from said hole the mass of coarse gravel so deposited on said land is two and one-half feet in depth. But the deposits of earth, sand and

gravel over said tract are not of uniform character or depth, but were spread over said tract in varying streaks and scopes and depths of clean gravel, of clean sand, and of gravel, sand and earth intermixed. The tillable land of said tract was sufficiently so covered with arid sand and gravel as to practically destroy its value to appellant's damage in the sum of $1,324.

Appellant's husband and agent is, and for fifteen years last past has continuously been, by profession and occupation a civil engineer; that before the construction of the inter-highland section of the Evansville line aforesaid, he had knowledge of the form of construction as was then by said Evansville company intended; that he then expressed to said Evansville company an opinion to the effect that the proposed trestle and bridge openings in said section of railroad would be insufficient to allow due passage of the waters in times of high Wabash river floods; that said Evansville company wholly disregarded said expression of opinion and modified the proposed plans in no respect by reason thereof, but did build and construct said inter-highland section of railroad according to said plans as then proposed, excepting that for reasons other than any consideration of said expression of opinion, the said section was by the Evansville company finally constructed with some modification of the openings at the trestle known as the Sumner ditch trestle by way of an enlargement thereof, but which enlargement was, with reference to floods of the extent of the floods of 1912 and 1913, too small to be material as furnishing additional passageway for the waters.

The action of the waters during the flood of January, 1913, was such as to wash and scour the site of said hole, as thereafter formed, to an area and depth sufficiently appreciable and material to substantially injure and damage the surface of said site and thereby to fur-

nish, and thereby did furnish, to appellees a warning of the dangers of washing and scouring incident to the maintenance of the embankments aforesaid with flowage openings of insufficient extent and capacity.

From the sole and single standpoint of the business needs of said Evansville line itself, as ·a railway to be operated for profits to be earned by transportation of passengers and freight, the inter-highland section hereinabove described and referred to, was in all respects carefully and skilfully designed, constructed and maintained. But with respect to the rights of the plaintiff herein the Evansville company by constructing, and both companies by maintaining, the inter-highland section of railway did obstruct to an unreasonable extent the natural flow of the Wabash river flood-waters; and said companies did construct and maintain said inter-highland section with an unreasonably and improperly small amount and ratio of total flowage openings as compared with and as in proportion to the total obstructing surface, effect and influence of said embankments; and did thereby dam said waters up to an unreasonable extent and discharge them through said Sumner ditch opening in unreasonably, unaccustomedly and unnaturally great velocities, volumes and downward slopes of surface plane, all in the manner and with results as above set forth. Said damming and discharging was the direct, controlling, producing, immediate and proximate cause of the damage and injury to the "Bilderback forty" as hereinabove set forth; and that except for said damming and discharging said damage and injury would not and could not have occurred; and that defendants and each of them at all times knew, or in the exercise of due care should and would have known that said construction and maintenance in manner· and form as herein described constituted as aforesaid an unreason-

able and dangerous obstruction to the flood waters of said Wabash river.

The waters whereby the injuries and damages were inflicted on appellant's lands were flood waters of, and characteristically belonging and appertaining to, the Wabash river, and excepting such negligible quantities as evaporated or settled in pools in swamps upon subsidence of flood conditions, said waters all returned to the main channel of said river or flowed to the Ohio river with, along and as part of, the Wabash river currents.

At all times prior to the March flood, 1913, the Evansville company, in planning, designing and constructing the inter-highland section of railway aforesaid, and each and both said companies in maintaining said section of railroad knew, or in the exercise of due and reasonable care and diligence could and must have known, and were reasonably bound to anticipate, that the Wabash river waters were likely and liable again to attain flood conditions that existed during the flood of August, 1875, as set forth in special finding No. 9, and that they were likely and liable also to attain, by reason of changed conditions in respect of additional ditching, drainage, sewerage, tiling, denudation of forests, and similar processes of development throughout the drainage area of the Wabash river since August, 1875, a slight additional depth at the Mt. Carmel gauge; but neither of said companies at any time knew, or in the exercise of due and reasonable care and diligence could or should have known, nor were they reasonably bound to anticipate, that said waters were likely and liable to attain, or that they ever would attain flood conditions of volume and depth substantially as or nearly approximating the extreme volume and height of 31.1 feet at the Mt. Carmel gauge or the unprecedented rate of rise set forth in special finding No. 20, was likely to ever occur con-

currently with similar depth of flood water at the Mt. Carmel gauge.

Had said inter-highland section of railroad, as hereinabove described, existed during the aforesaid flood of August, 1875, the total amount of openings for water passage through said railroad and the ratio and proportion of total openings to total obstructions would not have been adequate to permit the said waters to flow in sufficiently natural manner to avoid some degree of material and recoverable damage and injury to the "Bilderback forty" by the deposit of earth, sand and gravel thereon and thereover, all in the manner as hereinabove particularly found; but were and would have been adequate to avoid such injury and damage to the great extent that was by said "Bilderback forty" thereby suffered in 1913, as aforesaid. At all times prior to the March flood, 1913, defendants and each of them knew, or in the exercise of reasonable care and diligence could and must have known, and were reasonably bound to anticipate, that by reason of the said obstruction and the inadequacy of openings therein, all as aforesaid, some degree of material and recoverable damage and injury to said "Bilderback forty" by deposit of detritus thereon, as aforesaid, was likely and liable to occur and would occur; but neither defendant at any time knew, nor could or should have known, nor was bound to anticipate, that the extent and measure of said damage and inquiry would be so great as it actually was during the March flood, 1913; that is to say, that the entire damage and injury to said tract was not proximately caused by the unprecedented volume of water, but the degree and extent of the damage and injury was by the unprecedented volume of water accentuated and augmented; that, by no act of negligent omission or commission did plaintiff in any degree contribute to any of the aforesaid damages and injuries to any part of her

lands. Also the following with special reference to the Watts quarter section: While the Wabash river flood waters for long stretches of distances were overflowing the tops of the railroad embankments they caused at one particular point on what is designated as embankment No. 2 at a distance of 200 rods northwest of the Sumner ditch trestle, an extensive washout of said embankment; that at said time and place the vertical height of the waters on the up-stream side of the embankment was greater by a maximum excess of four feet than the corresponding waters on the down-stream side; that said washout was not caused by a lateral pushing aside of said embankment nor of any part thereof by the weight, pressure or current of said waters; but that said waters had the effect at said particular point of starting the washout by saturating and softening, and by washing and scouring off the top of the embankment so as to work out a course or channel across the same; that, after the start was so made, the action of the water was progressive and by force of continuous current through the same the channel grew larger and larger until at said point the embankment was wholly torn away, thus affording a gap or opening down to ground level, and of many square yards in extent, for the passage of the flood waters, and through which vast volumes of water moved with downward incline of surface plane and in velocity as herein described with reference to the Sumner ditch opening; that no similar washout occurred at any other point of the overflowed embankments, and that the reason for the occurrence of said washout at the particular point in question rather than at some other point on said embankment is unknown.

By reason of said washout, and the conditions attendant thereupon, the waters so operated as to scour, gouge out and excavate at, below and about said washout a

series of extensive holes in the ground and to carry westwardly and south-westwardly across a strip of intervening territory, known as the Alcorn land, to the Watts quarter section and to cast, scatter and distribute upon and over said Watts quarter section at a maximum distance of half a mile from said hole, a vast tonnage of earth, sand, fine gravel and coarse gravel, so washed out from said holes; that the tillable land of said Watts quarter section was sufficiently so covered with arid sand and gravel as to diminish the value thereof in the sum of $6,000.

The unreasonable and improper construction of the inter-highland section of railroad materially contributed to the washout and the consequence thereof; that said washout and its consequences would not and could not have occurred except for such improper construction; but said washout and its consequence were primarily and proximately caused by the unprecedented character of the March flood, 1913, with respect to volume and sudden rise of the Wabash river at said point, rather than by the unreasonable and improper construction; that had said flood not been of the unprecedented character the washout and its consequence would not and could not have occurred, notwithstanding the improper construction; that neither of the defendants at any time knew, nor in the exercise of due and reasonable care and diligence could or should have known, nor were ever reasonably bound to anticipate, that even in view of said improper construction the Wabash river flood waters were likely or liable to rise, or that they ever would or could rise at said point at such unprecedented rate and to such unprecedented height as to cause such washout and its consequences nor in any washout or breakage of said embankment at said point; and that any washout or breakage of the embankment at or near

said point was at all times wholly beyond reasonable foresight and anticipation.

On the foregoing facts the court stated the following conclusions of law: "(1) That the construction by defendant Evansville, Mt. Carmel & Northern Railway Company of the inter-highland section of railway hereinabove described, in manner, form and condition, all as hereinabove found, was a careless and negligent act and proceeding by and on the part of said defendant. (2) That the maintenance by both defendants herein of the inter-highland section of railway hereinabove described, in manner, form and condition, all as hereinabove found, was a careless and negligent act and proceeding by and on the part of both said defendants and each of them. (3) That in respect to the losses and injuries to the Bilderback forty, hereinabove described, and all as hereinabove found, the law is with the plaintiff and the plaintiff is entitled to recover upon her complaint herein a judgment against both defendants for $1,324.00 damages, and for the costs in this action laid out and expended and properly taxed. (4) That although the losses and injuries to the Watts quarter section hereinabove described, and all as hereinabove found, was materially contributed to by the negligent acts of defendants herein, and each of said defendants, neither of said defendants is liable, and said defendants are not liable, to respond in damages therefor, for the reason that no losses and injuries whatever of the character found could reasonably have been expected or anticipated to result from said negligent acts or either of them; and that no judgment in damages for said losses should be rendered herein."

Appellant, Roberta G. Watts, has filed her motion to dismiss her adversaries' appeal on the ground

1. that, as her appeal was first to be perfected, the railway companies. instead of taking a separate

appeal, should have assigned cross-errors; and she insists that if the companies wished to present any part of the record not required by her praecipe they should have filed a praecipe of their own, requiring the clerk to incorporate into her transcript the portions of the record desired by them, so that all matters involved in the controversy could be presented by one transcript and adjudicated in her appeal. On May 10, 1916, this motion was considered and action thereon was postponed to the final hearing. Thereafter, on the petition of the railway companies, an order was made that the two appeals be consolidated and briefed as one cause. The right to assign cross-errors has long been established. (Elliott, Appellate Procedure §415) ; and a simple method is provided by statute whereby any party other than the appellant may have incorporated in the transcript any part of the record which is not required by appellant's praecipe. §667 Burns 1914, Acts 1903 p. 338, §7. But it might be that neither this method nor the writ of *certiorari* would be adequate for some cases. Therefore, while the plan suggested by counsel for Roberta G. Watts is entirely proper in certain cases, it is not exclusive. The case of *Horne* v. *Harness* (1897), 18 Ind. App. 214, 47 N. E. 688, on which she relies as supporting her motion to dismiss, is readily distinguishable from the case at bar. The motion to dismiss is overruled. The consolidated appeals will be considered as one cause; the errors assigned by the railway companies will be treated as cross-errors; and to avoid confusion, Roberta G. Watts will be referred to as appellant and the railway companies as appellees.

The first objection to the complaint presented by the memorandum to the demurrer is that the complaint shows affirmatively that the injury to appellant's lands for which she seeks recovery was occasioned by the action of surface water, the flowage of which appellees had

a right to obstruct for their own protection without incurring liability for injury resulting to the lands of others occasioned by such obstruction.   The second objection so presented is that the facts alleged are not sufficient to justify an inference of a want of due care even though it be conceded that the water which caused the damage was not surface water and that appellees were required to exercise care in the construction of its embankments, bridges and culverts so as not to cause the flowage of such water to damage others on account of such structures.   The same questions are presented in a different form by the exceptions of appellees to the conclusions of law pronounced by the trial court on its special finding of facts.   The demurrer to the complaint and the exceptions to the conclusions of law will not be separately discussed, but the propositions of law presented thereby will be considered in the order of their presentation.

It is well settled that water running over land outside of and apart from any natural or artificial water course is surface water.   It is also well settled that a 2. lower proprietor may dam against such water, to prevent it from entering on his land, and that he cannot be held liable for damages resulting from the accumulation of water above the obstruction or because such obstruction causes the water to flow onto the lands of another to his damage.  *Taylor, Admr.,* v. *Fickas* (1878), 64 Ind. 167, 31 Am. Rep. 114; *Cairo, etc., R. Co.* v. *Stevens* (1881), 73 Ind. 278, 38 Am. Rep. 139; *Clay* v. *Pittsburgh, etc., R. Co.* (1905), 164 Ind. 439, 73 N. E. 904.

It is also well settled that the owner of land is not liable for damages to lands of another occasioned by the surface water flowing therefrom as it naturally 3. flows over the surface of the ground; but he may not collect the surface water into a channel and

cast it onto the lands of a lower proprietor, either intentionally or negligently, without incurring a liability for the damages caused thereby. *Templeton* v. *Voshloe* (1880), 72 Ind. 134, 37 Am. Rep. 150; *Culbertson* v. *Knight* (1899), 152 Ind. 121, 52 N. E. 700.

The rule stated applies to water flowing on the surface of the land as a result of precipitation, and not flowing as a part of, or in connection with, a natural watercourse. The direct question here presented is: Does the rule apply to waters flowing over the lowlands adjacent to a natural stream or watercourse as a result of high water or freshets, causing the stream to overflow its natural banks, which overflow water follows the course of the stream to its outlet or on the subsidence of the water returns to the channel except in so far as it has evaporated or settled in low places on the overflowed land? Some of the earlier cases in this state hold such overflow waters to be surface water to which the rules above stated apply. *Taylor* v. *Fickas, supra; Shelbyville and Brandywine Turnpike Co.* v. *Green* (1885), 99 Ind. 205; *Jean* v. *Pennsylvania Co.* (1893), 9 Ind. App. 56, 36 N. E. 159. The later cases by this court seem to have reversed the rule stated in the earlier cases without referring to such cases or expressly overruling them. *New York, etc., R. Co.* v. *Hamlet Hay Co.* (1897), 149 Ind. 344, 47 N. E. 1060, 49 N. E. 269; *Northern Ind. Land Co.* v. *Brown* (1914), 182 Ind. 438, 106 N. E. 706. These later cases hold that the rules of law applicable to surface waters cannot be held to govern conduct with respect to overflow waters of streams such as are heretofore described. The earlier cases must be regarded as overruled on this point by the cases last cited. The court is satisfied with the rule last announced as it seems to be supported by reason and also seems to be sustained by the great weight of authority. *Cairo, etc., R. Co.* v. *Brevoort*

(1894), 62 Fed. 129, 25 L. R. A. 527; *O'Connell* v. *East Tenn., etc., R. Co.* (1891), 87 Ga. 246, 13 S. E. 489, 13 L. R. A. 394, 27 Am. St. 246; *Macomber* v. *Godfrey* (1871), 108 Mass. 219, 11 Am. Rep. 340; *Byrne* v. *Minneapolis, etc. R. Co.* (1888), 38 Minn. 212, 36 N. W. 339, 8 Am. St. 668; *Uhl* v. *Ohio River R. Co.* (1904), 56 W. Va. 494, 49 S. E. 378, 68 L. R. A. 138, 107 Am. St. 968, 3 Ann. Cas. 201; *Crawford* v. *Rambo* (1886), 44 Ohio St. 279, 7 N. E. 429.

It thus appears that appellees must fail in their contention that the facts alleged in the complaint and found specially by the court do not disclose any duty imposed on them by law requiring the exercise of care in appellant's favor. The duty imposed was to use ordinary care in the construction of its railroad across the river and the adjacent lowlands subject to overflow, in view of all the circumstances and conditions which were known, or which could have been known by the exercise of due care, as well as all conditions which could have been reasonably foreseen or anticipated. Their duty was to use reasonable care in view of all such conditions to construct their embankments and the openings therein in such a way as not to expose the lands of others to damage of being injured by unnatural flow of water occasioned by such construction. The agents of appellees were not required to foresee every condition and to provide against every danger which, in the course of events, actually did arise. They were not insurers as against all dangers, but they were required to exercise ordinary care in providing against such dangers as might have been reasonably foreseen by the exercise of ordinary care and judgment. *Cleveland, etc., R. Co.* v. *Wisehart* (1903), 161 Ind. 208, 67 N. E. 993; *Bellinger* v. *The New York Central R.* (1861), 23 N. Y. 42.

The foregoing statement defines the duty as it existed

at common law; but a statute of this state is cited which seems to be relied on with some confidence as

6. operating to change the common law and to impose on railroads a different or higher duty in the construction of its road across streams than that imposed by common law. The statute relied on reads as follows: "Every such corporation shall possess the general powers, and be subject to the liabilities and restrictions expressed in the special powers following: * * * Fifth. To construct its road upon or across any stream of water, watercourse, highway, railroad or canal, so as not to interfere with the free use of the same, which the route of its road shall intersect, in such manner as to afford security for life and property; but the corporation shall restore the stream or watercourse, road or highway, thus intersected, to its former state, or in a sufficient manner not to unnecessarily impair its usefulness or injure its franchises." §5195, cl. 5, Burns 1914, Acts 1911 p. 136.

It has been held by this court that the same duty imposed by this statute rested on railroad companies at common law and that the statute simply declares the common-law rule. *Chicago, etc., R. Co.* v. *Luddington* (1910), 175 Ind. 35, 91 N. E. 939, 93 N. E. 273. In the case of *Cleveland, etc., R. Co.* v. *Wisehart, supra,* it is said: "But the company, in building its road upon or across such stream or watercourse, is not to be considered or held an absolute insurer against all injury or damage to the property of others, but it is required to exercise proper care and skill under the circumstances in order to avoid injury or damage to the property of another; but beyond this it is not required to go."

It is frequently less difficult to make a statement of the rules of law than it is to make a correct application of those rules to the case in hand as disclosed by the record. As bearing on the question of due care in the

construction of the railway embankment across the low grounds adjacent to the Wabash river and subject to overflow, the following facts are taken from the special finding of the court. The Wabash river, from its source to the structure involved in this case has a length of 432 miles, with an average fall of 1.44 feet to the mile. The total area drained by the river and its tributaries is 27,747 square miles. In the years 1910 and 1911 the Evansville company constructed its road-bed across the Wabash river which is a natural watercourse and also across the lowlands on each side thereof. The length of the structure from highlands on the Indiana side to the highlands on the Illinois side was and is about 34,537 feet. There was a bridge spanning the low-water channel of the river and the road-bed on each side was constructed on solid embankments of earth with numerous culverts and trestle works leaving openings for the passage of water. The court finds that 79.3 per cent. of the inter-highland structure is composed of solid embankment and 20.7 per cent. is represented by openings. The height of the structure above the land on which it was built ranged from twenty-three feet at its highest point to five feet near the highlands, from which point the height gradually decreased to the highland ground level. At the time the structure was built, and always prior thereto, the river at that place, and for many miles above and below, was subject to overflow in times of freshet and high water, at which times the water overflowed the banks, and inundated the land on both sides of the river to a considerable depth, varying according to the height of the water. The highest water in the channel of the river as shown by the records kept by the government from 1885 to 1910 was 27.1 feet and the lowest occurring within the same period was 8.4 feet. The height of the water during the time varied between the high-water mark and

the low-water mark. In August, 1875, as found by the court, waters of the Wabash river attained a height equal to twenty-eight feet at the Mt. Carmel gauge, which was the highest stage of waters at said locality known to history or tradition prior to the year 1913.

It is further shown by the special finding that the Evansville company, at the time of planning and constructing the inter-highland section of its railroad, and that both appellees, during the time such structure was maintained, knew or could have known by the exercise of ordinary care that the flood waters of the Wabash river were likely to attain the height and volume reached by the flood of August, 1875; and that, in view of changed conditions in respect to tiling and drainage of lands and denuding them of forests, thus facilitating the flow of water into the Wabash river and its tributaries, they should have foreseen by the exercise of due care that a slight additional depth might likely occur at the Mt. Carmel gauge.

The court has thus found and stated the conditions which existed at the time the structure was built, and also the conditions which might have been reasonably foreseen and provided against. It was the duty of appellees to exercise ordinary care, in view of all these conditions to construct and maintain its road-bed in such a manner as not to expose the lands of adjacent proprietors to the danger of being damaged by water dammed, diverted or caused to flow in an unnatural manner or with increased volume or current by reason of obstructions created by the structure. If the road-bed was constructed and maintained with such openings for the passage of water, and in such a manner as persons of ordinary prudence and reasonable skill would have constructed a like work, in view of all the conditions known, or that might have

been learned or foreseen by the exercise of reasonable care on their part, then the duty of appellees was fulfilled. If not so constructed, the conduct of appellees failed to measure up to the standard of care required and they were guilty of negligence.

The court finds facts specifically and in detail which show that the conduct of appellees in the construction and maintenance of their road-bed at the place described did not measure up to the legal standard of ordinary care. They were therefore, guilty of negligence and were legally bound to answer in damages for all resulting injury of which such negligence was the direct and proximate cause.

Appellees further contend that they are not liable for the injuries described in the complaint, even though it be found that they did not exercise due care in 7. the construction and maintenance of the road-bed in view of conditions which would probably have been foreseen by persons of ordinary skill and prudence. It is the position of appellees that the negligence thus shown was not the proximate cause of the injury to appellant's lands as described in the complaint and shown by the evidence. The reason advanced to support this position is that the injury of which appellant complains was caused solely by the unprecedented flood of March, 1913. The facts showing the volume, depth and extent of this flood are fully set forth in the special finding. The court therein finds that this flood attained a height three feet in excess of any former flood known to history or tradition, and that the occurrence of a flood of such a height and volume could not have been foreseen by the exercise of due care and prudence. It is well settled that there is no remedy for an injury caused solely by an act of God or *vis major*. *Read* v. *Spaulding* (1864), 30 N. Y. 630, 86 Am. Dec. 426.

It is equally well settled that, where an injury occurs as a result of negligence operating concurrently with a major force or an act of God, the person or agency responsible for the negligence is answerable for all resulting damages, provided the negligence was a proximate concurrent cause of the resulting injury. *Polack* v. *Pioche* (1868), 35 Cal. 416, 95 Am. Dec. 115; *Read* v. *Spaulding, supra.*

The negligence of appellees, as shown by the court's finding, consists of their failure to provide openings sufficient in extent to accommodate the overflow waters attendant on floods such as should have been foreseen by the exercise of due care. As to the Bilderback forty, the court finds that the inadequacy of openings caused the waters to converge and flow through such openings in greater volume and with increased velocity and downward slope of surface, and that this action of the water, so caused by the negligence of appellees, directly and proximately caused the injury to the land as specifically described in the special finding. It is further found that the openings were of such inadequate size and extent as to expose the particular tract of land to the danger of being damaged by the flow of water attendant on floods which might have been reasonably foreseen, and that some such damage could have been foreseen by the exercise of reasonable care; but that the damages which actually resulted were much enhanced by the waters of the unprecedented and unforeseen flood, the force and effect of which operated in conjunction with the negligence of appellees in causing the injury which actually occurred. Applying the law as heretofore stated, it is clear that appellees were liable to respond in damages for all injury resulting to the "Bilderback forty" and that the trial court properly so held by its third conclusion of law.

With respect to the "Watts quarter section," the court

in effect finds that the negligent failure of appellees to provide openings sufficient in extent to accommodate the water attendant on floods which could have been reasonably foreseen did not expose this tract of land to the danger of suffering damage as a result of the force and effect of the flow of water attendant on such floods and that no such damage as actually resulted could have been foreseen by the exercise of ordinary care. The court finds that the waters of the flood of 1913 rose to a height never before known, and for long stretches flowed over the railroad embankment. The flood water above the embankment was held back and accumulated to such an extent that the vertical height of the water on the up-stream side was four feet in excess of the corresponding water on the down-stream side. At a point about 200 feet northwest of the Sumner ditch trestle, the waters flowing over the top of the embankment eroded a channel across the embankment, which was deepened and widened by the increased flow and volume of water until the embankment at that place was entirely worn and carried away, making a break in the embankment down to the ground level. The waters rushing through the opening thus formed washed out and excavated a large hole in the ground and carried the detritus over and upon the Watts quarter, as more specifically described in the special finding.

By its fourth conclusion of law the court announced that appellees were not legally liable to respond in damages for the injury thus caused to the tract of land known as the "Watts quarter." The correctness of this conclusion is challenged by appellants' assignment of errors.

10. If, in erecting and maintaining the structure in question, appellees had exercised due care to provide against all dangers which might have been reasonably expected to arise from all conditions that

could have been foreseen in the exercise of reasonable care and prudence, it would have been free from negligence and could not have been held liable for any injury resulting from an unforeseen danger; but if it failed to use reasonable care to provide against dangers likely to result from conditions which might have been reasonably foreseen it was guilty of negligence. If, then, an unforeseen danger arose due to conditions which could not have been anticipated and caused damage to the property of appellant, the liability of appellees must be settled by determining whether or not the negligent failure of appellees to provide against the dangers which could have been reasonably anticipated was the proximate cause of the danger which actually arose by reason of a condition that could not have been reasonably foreseen. If due care in providing against dangers which could have been reasonably anticipated would have prevented or avoided the unforeseen danger which actually arose and caused the injury, then, the negligence in failing to use such care must be regarded as the proximate cause of the injury if acting alone, and if acting in conjunction with another force, such as the act of God, it must be deemed a concurring proximate cause. On the other hand, if the observance of due care in providing against known dangers would not have prevented or turned aside the danger which arose and produced the injury, then, the failure to observe such care could not be regarded as a proximate cause of the injury.

In determining whether an act or omission is or is not negligence, the question must depend on whether an injury of some kind to some person could reasonably have been expected to result; but, when it has been determined by an application of this principle that there has been a failure to use care by the party charged with negligence, it then becomes unim-

portant whether the particular injury which actually occurred could have been reasonably expected to happen in the particular manner in which it occurred. In such cases, the law imposes liability for all injurious consequences which result directly and proximately from the negligence, whatever they are, and regardless of whether they might or might not have been reasonably foreseen. *Cleveland, etc., R. Co.* v. *Clark* (1912), 51 Ind. App. 392, 97 N. E. 822; *Davis* v. *Mercer Lumber Co.* (1905), 164 Ind. 413, 73 N. E. 899; *Louisville, etc., R. Co.* v. *Wood* (1888), 113 Ind. 544, 14 N. E. 572, 16 N. E. 197.

It cannot be said that there was no relation or causal connection between the negligence of appellees in failing to provide adequate openings to accommodate the flow of water in times of floods such as could have been reasonably anticipated, and the height of water attained at the place by the flood of 1913. The trial court found in effect that the failure of appellees to provide such adequate openings dammed back the water and caused it to accumulate on the up-stream side of the embankment to such an extent as to give it a vertical height of four feet in excess of the corresponding water on the down-stream side of the embankment. It thus appears that the negligence of appellees operated in conjunction with the unprecedented flood in causing the water to rise to such a height as to overflow the surface of embankment and to erode and wash it away with all the consequences which ensued, as specifically shown by the special finding.

The specific finding of the trial court on this question is: "The unreasonable and improper construction of the inter-highland section of its railroad materially contributed to the washout and the consequences thereof; that said washout and its consequences would and could not have occurred except for such improper

construction; * * * that, had said March flood of 1913, not been of the unprecedented character aforesaid, said washout and its consequences, notwithstanding such improper construction, could and would not have occurred."

A well-known author on the law of negligence states the rule applicable to such a state of facts in the following language: "It is universally agreed that, if the damage is caused by the concurring force of the defendant's negligence and some other cause for which he is not responsible, including 'the act of God' or superior human force directly intervening, the defendant is nevertheless responsible, if his negligence is one of the proximate causes of the damage, within the definition already given. It is also agreed that, if the negligence of the defendant concurs with the other cause of the injury, in point of time and place, or otherwise so directly contributes to the plaintiff's damage that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable, notwithstanding he may not have anticipated or been bound to anticipate the interference of the superior force which, concurring with his own negligence, produced the damage. But if the superior force would have produced the same damage, whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury." 1 Shearman and Redfield, Negligence (5th ed.) §39, and cases cited in support of the text.

Applying the law as stated to the facts as found, the court is of the opinion that the negligence of appellees was a direct and proximate cause which operated in conjunction with the act of God in producing the injury to the land designated as the "Watts quarter." The trial court erred in the law as announced in its fourth conclusion.

The preceding discussion disposes of most of the ques-

tions presented under the assignment of errors based on the action of the trial court in overruling appellees' motion for a new trial. It is clear from such discussion that the finding of the court is not contrary to law. It is asserted that there is no evidence to show that the appellees were guilty of negligence. The court finds in substance that they negligently failed to construct the embankment in such a way as to leave openings of sufficient breadth and capacity to adequately accommodate the overflow waters of floods that ought to have been anticipated. While the evidence on this subject is conflicting, there is evidence to sustain the finding.

The other questions presented by the brief under this assignment of error are of such minor importance that the rulings of the court in reference thereto, even if erroneous, would not constitute reversible error.

As to the errors assigned by appellant, the judgment is reversed, and, as to the cross-errors assigned by appellees, the judgment is affirmed. It is therefore ordered that the court restate its fourth conclusion of law in conformity with this opinion and so modify the judgment as to conform to the conclusion of law as restated.