**Steve ARGYELAN and Anna Argyelan, Appellants (Defendants Below),**

**v.**

**Harold HAVILAND and Maxine Haviland, Appellees (Plaintiffs Below).**

**No. 2–1179A334.**

Court of Appeals of Indiana, Second District.

April 13, 1981.

Rehearing Denied May 19, 1981.

R. Victor Stivers & Associates, Indianapolis, for appellants.

Burton Lamey & Jensen, Indianapolis, for appellees.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Appellants-defendants Steve and Anna Argyelan (Argyelans) appeal from a $7,500 judgment in favor of appellees-plaintiffs Harold and Maxine Haviland (Havilands), claiming the decision of the trial judge is not supported by Indiana law governing disposal of surface waters.

We reverse.

## FACTS

The evidence and facts most favorable to the trial court's judgment are:

In early 1970, the Argyelans (Defendants-Appellants) bought about two acres of land located in the 4900 block of West Wash-ington Street in Indianapolis. The land is bounded on the south by the property of the Havilands (Plaintiffs-Appellees). At the time of purchase, the two lots comprising the Argyelans' parcel were wooded with no buildings on them, although previously there had been a large two-story house.

Soon after the land was purchased, Steve Argyelan had the lot farthest from the Havilands rezoned from a residential to a business classification. Following that rezoning, a building which was completed in 1971 was built on the lot. In 1973 Argyelan rezoned and started building a structure (the second building) on the southern portion of his property. That building was completed in 1974.

In improving his land, Argyelan raised the level of the soil about two feet by adding fill and erecting a two-foot high retaining wall about one foot on his side of the Haviland/Argyelan property line. Later, a chain link fence was built on top of that retaining wall. The top of the retaining wall was constructed to stand about four inches higher than the ground on Argyelans' side, but stood from 6"–8" to 2'–2½' higher than the Havilands' grounds.

The exhibits indicate that the second building is a one-story brick structure with its southern wall at least twenty feet from the retaining wall. Three downspouts provide drainage for the roof, two of them terminating in standard downspout footings which point south towards the Haviland property; the third was diverted through a plastic pipe to the east, terminating 50' from the eastern property line, and about twenty feet from the southern line with the Havilands' property. The record discloses nothing unusual about the downspout footings. The twenty-foot strip of land lying between the building and retaining wall is crushed stone, which allows percolation of water. The balance of Argyelans' lot is blacktopped; natural drainage is to the south and east.

Following completion of the second building, the Havilands complained that their ground near the boundary with the Argye-

lans was being submerged by several inches of water after a moderate to hard rain. Uncontroverted testimony indicates that when there is enough rain to fill the four-inch space on Argyelans' side of the wall, water would wash over it onto Havilands' property. Plaintiffs claim that such over-flow caused damage to their garage and a utility shed.

Because of a generalized drainage prob-lem in the neighborhood, the City of Indian-apolis offered to meet with residents to discuss construction of a drainage ditch. Apparently the meeting was never held due to lack of interest.

The Havilands sued the Argyelans, alleg-ing they accumulated and discharged large quantities of water onto their land, asking for $15,000 damages and injunctive relief.

A bench trial was held in Marion County Circuit Court resulting in judgment for the plaintiffs in the amount of $7,500.

The Argyelans appeal.

### ISSUE

The sole issue is:

Is an owner of improved land liable to an adjacent landowner for damage caused by run-off of surface water caused in part by improvements to the land, even though there is no direct channeling of water onto the adjacent parcel?

### DECISION

CONCLUSION—It it our conclusion that, considering the evidence most favorable to the judgment, the Argyelans were not lia-ble for damage caused by the surface water run-off from their land.

The record in this case contains no find-ings of fact. "Where no findings are made the general judgment entered by the court is presumed to be based upon findings sup-ported by the evidence." *Ray v. Goldsmith* (1980), Ind.App., 400 N.E.2d 176. Unfortu-nately the evidence most favorable to the judgment does not support it.

■ Indiana follows the "common enemy rule" governing surface waters which has been defined thusly:

[A] lower property owner may dam against such water to prevent it from entering onto his land and . . . cannot be held liable for damages resulting from the accumulation of water above the ob-struction or because such obstruction causes the water to flow onto the land of another. *Watts v. Evansville, Mt. Car-mel and Northern Railway Co.* (1921), 191 Ind. 27, 129 N.E. 315; *Gwinn v. Myers* (1955), 234 Ind. 560, 129 N.E.2d 225; *Capes v. Barger* (1953), 123 Ind.App. 212, 109 N.E.2d 725; *Thompson v. Dyar* (1955), 126 Ind.App. 70, 130 N.E.2d 52; *Lowe v. Loge Realty Co., Inc.* (1966), 138 Ind.App. 434, 214 N.E.2d 400. *The only limitation outlined in the above cases is that a landowner may not collect surface water into a body and then discharge it on to another's land.*

*Cloverleaf Farms, Inc. v. Surratt* (1976), Ind.App., 349 N.E.2d 731, 732 (Emphasis added). *Accord, Gene B. Glick Co., Inc. v. Marion Construction Corp.* (1975), 165 Ind. App. 72, 331 N.E.2d 26, reh. denied 333 N.E.2d 410.

The origin of the rule is obscure. One commentator lays the blame for the doc-trine's unique name upon a confused New Jersey court, which misquoted an early English opinion referring to "the sea [as] a common enemy."[1] The rule has only been applied to surface water. "The law has wisely discriminated between the rules which apply to watercourses, and those which apply to surface water." *Taylor v. Fickas* (1878), 64 Ind. 167, 176.

The situation before us involves the flow-age of *surface water* as defined in *Capes v. Barger* (1953), 123 Ind.App. 212, 109 N.E.2d 725:

Water from falling rains or melting snows which is diffused over the surface of the ground or which temporarily flows

---

1. Dobbins, Surface Water Drainage, 36 Notre Dame Law. 518, 519 (1961) citing *Town of Union Administrator's Durkes*, 38 N.J.L. 21 (Sup.Ct.1875); *The King v. Commissioners of Sewers for Pagham, Sussex*, 8 Barn. and C. 356, 108 Eng.Rep. 1075, 1076 (K.B.1828).

upon or over the surface as the natural elevations and depressions of the land may guide it but which has no definite banks or channel, is surface water.

*Id.* at 726. See also *Gwinn v. Myers* (1955), 234 Ind. 560, 129 N.E.2d 225; *Taylor v. Fickas, supra.*

One hundred years ago in a case involving surface water, the Indiana Supreme Court observed:

It is difficult to invent a formula for the statement of a rule of law which will accurately express the rule in its application to varying circumstances; and it may be that there is some verbal inconsistency in the formulas quoted from these opinions of this court, but when applied to the subject-matter of each there is no inconsistency of principle involved or expressed.

*Cairo & V. R. Company v. Stevens* (1881), 73 Ind. 278, 283.

We agree that "verbal inconsistencies" may obscure the true parameters of a rule of law, and the intervening century of case law on the subject of surface waters emphasizes the accuracy of the above quotation. As the court did in *Cairo, supra*, it is important to pay heed to the exact circumstances of the factual situations presented in the case law rather than the sometimes imprecise terminology used. Thus, we proceed to review the cases ever mindful of our limited standard of review. T.R. 52(A).

The record in this case gives no indication whatsoever of the existence of any ditches, flumes, or direction of freshets. Appellees' reliance on *Gene G. Blick Company, Inc. v. Marion Construction Corporation, supra*, is thus misplaced. That case featured "concentrated flowage" to various points along the property line, conducted there by channels and ditches. By way of dicta the *Glick* court described a situation in which liability could not be imposed:

While we do not find that Glick is liable for any increase in quantity of discharge, or the fact that discharge *per se* is improper, we do find that there is liability for any damage which may result from the *concentrated* discharge of waters upon land.

*Id.* at 32, emphasis in original.

*Glick* featured a concentrated discharge of water markedly contrasting with the type of discharge revealed by the record in this case. Here, the most favorable evidence shows water came over the retaining wall "like a waterfall." (*R.* at 118). Such wash is simply not the same thing as the concentrated channelling caused by a ditch. As the court said in *Glick*, discharge *per se* is not improper.

Another case in accord with *Glick* and the case law as we understand it, is *Cloverleaf Farms, supra*. There, the court reversed the trial court's judgment for plaintiffs stating that its conclusion was buttressed by "the absence of any proof that Cloverleaf collected surface water and propelled it in a body onto Surratt's property." *Id.* at 732. An affirmative, tortious act at the physical point of discharge was thus required to destroy the tort immunity conferred by the common enemy rule.

Similarly, *Smith v. Atkinson* (1962), 133 Ind.App. 430, 180 N.E.2d 542, is not applicable on its facts. That case also dealt with the obstruction of a watercourse and the enlargement of the flood-plain it served.

■ Although the Argyelans built a small retaining wall near their boundary, there were no cuts through the top of that parapet. Its effect, therefore, was to *protect* the Haviland property from water flowage, by distributing the flowage uniformly across the property line at least until the four-inch space on the Argyelan side filled up. In order to impose liability for surface water discharge, it must be collected on the defendant's land and "poured"—meaning in a concentrated volume—onto the plaintiff's land. *Mitchell v. Bain* (1895), 142 Ind. 604, 42 N.E. 230, 234 (emphasis added). This case is consequently distinguishable from situations such as that presented in *Templeton v. Voshloe* (1880), 72 Ind. 134, in which ditches were cut through an embankment.

■ Additionally, we are at odds with Havilands' assertion that *Conner v. Wood-*

*fill* (1890), 126 Ind. 85, 25 N.E. 876 is controlling. That case involved downspouts emanating from a church which was within eight feet of the property line. Argyelans' building is twenty feet away from the property line. There was a four-inch high retaining wall on Argyelans' property which held back the water. Even assuming that the downspouts did collect and discharge water, that act of concentration was negated by the existence of the retaining wall. The effect of the retaining wall was to spread any discharge from the downspouts evenly across the entire property line. In *Conner* the downspouts, like small ditches, directed water on plaintiff's land in concentrated streams. In this case, the water run-off is as it would be if no building had been constructed on Argyelans' property: the surface water flows evenly onto the adjacent property. No evidence in the record even remotely suggests that the existence of downspouts in any way affected the quantity or distribution of water crossing the property line, because of the retaining wall. Thus, *Conner* is inapplicable to the facts of this case. Additionally, the holding in *Conner* states: "The appellees were trespassers whenever they shed water from their building so as to *throw it* upon the appellant's lot." *Id.* at 876. (emphasis added). The record in this case discloses no such throwing, no such positive wrong.[2]

2. The following excerpts from the record are the only testimony pertaining to the type of flow which crossed from the Argyelan property to the Haviland property:

Q. When water is coming out of those downspouts, how does that flow? Does it flow toward your property?
A. Towards our house, yes, sir.
Q. What does it do when it gets to that concrete retaining wall?
A. It sort of holds it up and blocks it temporarily. I have seen it come over that wall.
Q. Like a waterfall?
A. Yes, sir, and over that and would wash. At that time, of course, naturally washing some of the stone and it would come floating over with it.
*R.* at 118. Testimony of Harold L. Haviland (Direct examination).
Q. When the water comes then off the building on the southside building, we will talk about the new building, when the water comes off that, is there not a retainer to channel the water on his side so that it runs to the east?
A. That is where this cement wall is erected, yes.
Q. And the cement wall is higher than his ground itself, is it not?
A. Yes.
Q. About how many inches, if you know?
A. You are speaking of—on my side it is about—... I would just have to guess. I don't know. Four, five, six inches. I don't know, to be sure on that because I don't know.
Q. But that then channels the water to the east, does it not?
A. East, yes, sir.
Q. I turn your attention to that which has been marked plaintiffs' exhibit number 10. The wall, it is my understanding, is to the south. Is it not?
A. Yes, sir.

Q. Raised about four or five inches you say?
A. Yes, I think it starts about I would say four or five inches in height or above the ground.
*R.* at 150–51. Testimony of Harold L. Haviland (cross-examination).
Q. Are there any drains that direct the water onto your land from Mr. Argyelan's property? A drain I'm talking about a drain either beneath the ground or one above the ground.
A. Not to my knowledge.
Q. There is what—there is downspouts, is that correct?
A. Yes.
Q. Now are these downspouts directed onto your property or onto his own property?
A. They are on his property.
Q. Now there is a retainer, you say, of what? Four or five inches on your property. Is that right?
A. Are you speaking of the cement wall?
Q. Uh huh.
A. Yes, which is about twenty foot from his building, yes. Yes, sir.
*R.* at 154. Testimony of Harold L. Haviland (cross-examination).
A. The downspouts? No, the downspouts are not on our property, no.
Q. Do they point towards your property?
A. Yes.
Q. Have you seen water run out of those downspouts towards your property?
A. Yes, sir.
Q. Is that the water that cascaded over the retaining wall?
A. I would say that, yes.
*R.* at 161. Testimony of Harold L. Haviland (redirect).
Q. What about after the retaining wall was built?
A. It helped very little. It held his gravel back but done us no good whatsoever.
Q. It didn't alleviate the problem?

There were no drains cut through the retaining wall. The Argyelan building lies at least twenty feet from the property line, and the retaining wall protected the Haviland property. The church in *Conner* stood eight feet from the property line, and the water flowed unimpeded onto the plaintiff's land.

Indiana cases interpreting exceptions to the common enemy doctrine have consistently required what may be characterized as a positive wrong to be committed against the owner of the land onto which water flows. The record in this case shows that there is no factual basis for classifying this case as an exception to the doctrine. There should therefore be no liability imposed on Argyelan.

While it is argued that we should affirm on the basis of *Conner*, the facts of this case when viewed in the broad context of all the Indiana case law on this subject require us to conclude that this fact situation more closely resembles those cases in which the common enemy rule is applied. We conclude that the Indiana Supreme Court inevitably has required three elements: (1) collecting surface water and (2) discharging it (3) in a concentrated flow. These three elements were present in *Conner*, in which water was collected in gutters, and discharged, in a concentrated fashion, by downspouts. The *Conner* court's word for the element of *concentrated* discharge was "throw."

A. No.
Q. Have you seen water flowing over the top of that retaining wall?
A. I have, yes.
Q. Have you seen water flowing out of the downspouts towards your property?
A. Yes.

*R.* at 171. Testimony of Maxine Haviland (direct examination).

Q. Now there is no—he doesn't have any drain directed over to your property, Mr. Argyelan?
A. You mean the downspouts?
Q. Yes.
A. The downspouts are directed in ours, on ours, yes.
Q. Drains, ma'am, where it would drain out and channel into your yard?

*Conner* has *never* been cited or followed by Indiana courts for its pronouncements regarding surface water run-off. It is therefore axiomatic that it has never been cited for the proposition that collection and discharge without concentration is actionable. (*Conner* has only been used by Indiana courts for the law it sets forth regarding prescriptive easements, which is not relevant to this inquiry.) All Indiana cases prior to and subsequent to *Conner* have required all three elements in order to remove a situation from the common enemy doctrine.

The tenor of Indiana cases dealing with surface water is accurately summarized in *Cairo & V. R. Company v. Stevens, supra*:

> The right of an owner of land to occupy and improve it in such manner and for such purposes as he may see fit, either by changing the surface or the erection of buildings or other structures thereon, is not restricted or modified by the fact that his own land is so situated with reference to that of adjoining owners that an alteration in the mode of its improvement or occupation in any portion of it will cause water, which may accumulate thereon by rains and snows falling on its surface or flowing on to it over the surface of adjacent lots, either to stand in unusual quantities on other adjacent lands, or pass into and over the same in greater quantities or in other directions than they were accustomed to flow.... *The obstruction of surface water or an alteration in the flow of it affords no cause of action in*

A. I don't know about any drains at all. I don't know about any drains.
Q. There isn't any there, is there?
A. Not that I know of.
Q. The downspouts run water onto his own property, don't they?
A. Run on his, yeah, and then onto us.

*R.* at 181. Testimony of Maxine Haviland (cross-examination). Thus, it is clear that there has been no throwing of water onto the Haviland property. In fact, the record shows that the Argyelan retaining wall benefited the Havilands by holding back surface water until it reached the level of four or five inches in depth.

*behalf of a person who may suffer loss or detriment therefrom against one who does no act inconsistent with the due exercise of dominion over his own soil.*
*Id.* at 282 (emphasis added). That Argyelans' construction projects were consistent "with the exercise of dominion over his own soil" is not controverted by the record.

An even stronger variation of the same theme, which harmonizes more closely with the facts in the case at bar, was rendered by a Pennsylvania court:

> The owners of lots in cities and towns buy and own with the manifest condition that the natural or existing surface is liable to be changed by the progress of municipal development. . . . The owner cannot be coerced as to the time or manner of improvement by risk of having put upon him the burden of providing for the flow upon others. . . . [S]o far as he acts upon his right to protect his enjoyment of his own property, any incidental loss to his neighbor is damnum absque injuria.

*Lare v. Young* (1943), 153 Pa.Super. 28, 33 A.2d 662, 663.

Because there is no evidence in the record that the Argyelans engaged in the positive, tortious, wrong of collecting surface water and discharging it in a *concentrated* flow upon the land of their neighbors, the Havilands, the "common enemy rule" prevails and the decision of the trial court must be reversed.

Reversed.

SHIELDS, J., concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

I respectfully dissent.

After a review of the record and my analysis of the law in this area, I must disagree with the majority's reasoning and conclusion. In so doing, I am mindful of the standard an appellate court must use in reviewing a trial court's judgment rendered without findings:

> "[I]f the action of the trial court is sustainable on any theory, it must be af-

firmed. [citation omitted] Further, it is well settled this court will not weigh conflicting evidence nor resolve questions concerning the credibility of witnesses. We may consider only that evidence most favorable to the prevailing party, together with all reasonable inferences to be drawn, and if from that viewpoint there is evidence of probative value to sustain the judgment of the trial court, that judgment will not be disturbed." *Ray v. Goldsmith* (2d Dist. 1980) Ind.App., 400 N.E.2d 176, 177.

Facts favorable to the judgment, some of which are not recited by the majority, are as follows: The parcel of land purchased by the Argyelans in 1970 consisted of two lots, both of which were unimproved at that time. The natural flow of surface water in the area was and still is in a general southeasterly direction from Washington Street, across the two lots owned by the Argyelans to the Havilands' property, and to a creek about one block away. This flow pattern made and makes the Havilands the lower property owners vis a vis the Argyelans.

The Argyelans' lot 10, bordering on Washington Street, was zoned for business at the time of purchase, and construction of a building was quickly completed in 1971. Lot 9, bounded on the south by the Havilands' property, was originally zoned for residential purposes but was rezoned for business. A second building was completed on this lot in 1974.

The second building's three downspouts are on its south side, the side towards the Havilands' property. The two end downspouts terminate in standard footings while the center downspout is diverted east along the building to a point approximately fifty feet from the Argyelans' eastern property line, and approximately twenty feet from their southern line with the Havilands' property.

It is uncontested that prior to the completion of this second building, although at times there may have been some standing water, the Havilands had no problem with flooding. It is also uncontested that the flooding begins only an hour after a moder-

ate to heavy rainfall, and can remain for up to twenty-four hours. Finally, as the majority concedes, when the top of the four-inch retaining wall is reached, water cast from the downspouts flows over the wall to the Havilands' property. The record shows the accumulation of water after a rainfall, due to this situation, to be much greater than would be dispensed by "average" downspouts.

The majority correctly cites *Cairo & V. R. Co. v. Stevens* (1881) 73 Ind. 278, for the proposition that an upper land owner has the right to make reasonable use of his property, including improvements thereon, without incurring liability for altering the accumulation or flow of surface waters. There are, however, limitations upon this right. For our purposes here, it is sufficient to state that while a land owner may make reasonable use of his property, he may not collect or concentrate surface water and cast it upon the lands of lower owners. *Patoka Township v. Hopkins* (1891) 131 Ind. 142, 30 N.E. 896; *Conner v. Woodfill* (1890) 126 Ind. 85; *Weis v. City of Madison* (1881) 75 Ind. 241; *Gene B. Glick Co. v. Marion Construction Co.* (1st Dist. 1975) 165 Ind.App. 72, 78–79, 331 N.E.2d 26, 31, *reh. denied*, 333 N.E.2d 140 (and cases cited therein).

While the majority of the "collect" or "concentrate" cases involve situations in which ditches or drains were used to channel surface water to the lower property, our Supreme Court has held that a downspout may also be used for this improper purpose. *Conner v. Woodfill, supra.* In *Conner* the Court twice stated the circumstances which required reversal in that case:

> "The rain-fall upon the building is shedded, as near as may be, one-half to the east and the other half to the west; at the southwest and northwest corners of the building are down spouts to receive and carry from the building the water which is shedded to the west side of said building; *passing through these spouts to*

the ground the water passes off the appellees' lot and on the lot of the appellant, to his injury, etc.

. . . .

*The appellees were trespassers whenever they shed the water from their building so as to throw it upon the appellant's lot.*" 126 Ind. at 86 (emphasis added).

The majority has here reviewed the evidence and has reached a conclusion contrary to that reached by the trier of fact. The majority conclusion necessarily hinges upon an assumption that the retaining wall totally negated the collection and discharge of water by the downspouts. The assumption is unwarranted, particularly in light of testimony that the water came over the wall "like a waterfall". That description would permit a conclusion imposing liability in that the water collected and discharged by the downspouts "poured [over the wall] in a volume" on to plaintiff's land. *Mitchell v. Bain* (1895) 142 Ind. 604, 42 N.E. 230, 234.[1]

The proper focus is upon whether the water has been collected, concentrated, and cast, and not upon the instrumentality used. In this light the majority's attempt to distinguish *Templeton v. Voshloe* (1880) 72 Ind. 134, and *Gene B. Glick Co. v. Marion Construction Corp., supra*, is invalid. The trial court here was thus faced with a purely factual question. That question was resolved in the Haviland's favor, and is supported by ample evidence in the record.

The trial court heard and weighed the evidence, making the requisite factual determination. We are not at liberty to overturn the decision, for it is not contrary to law, and as the record shows it is not against the weight of the evidence.

If in the 1980's, as opposed to the 1890's, greater deference should be paid to the beneficial or profitable use of land without the risk of incurring liability, such change must emanate from the legislature or from our Supreme Court.

I would affirm the judgment.

1. The majority gives an unwarranted and misleading implication to *Mitchell v. Bain, supra.* The majority gratuitously inserts the word "concentrated" as a modifier of "volume" and then proceeds to give it additional emphasis. (Majority opinion, p. 572.) The word "concentrated" is not found in the *Mitchell* decision.