GENE B. GLICK COMPANY, INC., EUGENE B. GLICK AND G & G DEVELOPMENT CORP. *v.* MARION CONSTRUCTION CORP. AND EDWIN M. RANSBURG.

[No. 1-375A46. Filed July 15, 1975. Rehearing denied August 28, 1975. Transfer denied February 13, 1976.]

*Gene E. Wilkins, Bamberger & Feibleman,* of Indianapolis, for appellants.

*John E. Hurt, McNutt, Hurt & Blue,* of Martinsville,

*Richard L. Gilliom, Stewart, Irwin, Gilliom, Fuller & Meyer,* of Indianapolis, for appellees.

LOWDERMILK, J.—The factual and legal history of this appeal stretches back over a period of more than sixteen years. The principal parties to this appeal were and are adjoining landowners in Marion County, Indiana. The defendants-appellants (hereinafter collectively referred to as "Glick") own and have developed the greater portion of the land which is situated immediately to the north, northeast, and northwest of the Ransburg property, with the construction of numerous residential subdivisions. The problems raised in this appeal are based on the fact that the Glick property occupies a topographically higher position than does the Ransburg tracts.[1] The tract of land immediately adjacent to Glick's property is owned individually by Ransburg. The remaining portion is owned by Marion Construction Corp. and Ransburg owns all of the corporate stock. As a result, the Ransburg property lies directly in the path of the overland drainage for the upper watershed area.

As the Glick houses replaced existing woods and fields, engineers found it necessary to redirect the natural flow of surface waters in order to fully develop the area. By a series of interconnected open ditches and subterranean storm sewers, various Glick-controlled companies and/or subcontractors thereof established a drainage system that ultimately vented at the southeast corner of the Glick properties. Unfortunately, this southeast corner was also the northeast corner of the Ransburg property.

In early 1959 it was discovered that an open ditch approximately six feet deep and three hundred feet long had been gouged into Ransburg's land along the northeast property line. This ditch was begun, however, only after a fence on the Ransburg property had been cut, and several hundred young trees destroyed. This ditch was later lengthened to an ultimate length of 525 feet and was connected to the north branch

---

1. See map included at the end of this opinion.

of Pleasant Run Creek, which began at a broken field tile some 50 feet inside the east line or Ransburg's property. Although it is unclear who ordered the digging of the ditch, there is evidence that the work was performed by a subcontractor of a Glick-controlled company.

Sometime shortly after Ransburg discovered the digging, a letter of protest was issued to Glick. Apparently, Glick then sought permission to refill the ditch on the Ransburg property, but only after he had acquired a strip of land fifty foot wide which ran north and south along the northeast line of the Ransburg property.

On September 22, 1959, the original complaint in this action was filed, Ransburg seeking injunctive relief and damages. In October of the same year, Ransburg informed Glick by letter that, without a waiver of any rights, the ditch could be filled under certain specifications. Glick then proceeded to dig a ditch on the newly acquired strip of land and use the soil excavated therefrom to fill the ditch on Ransburg's property. However, when the work was completed only the northern 300 feet of the Ransburg ditch was filled, and the new ditch was connected to the southernmost 225 feet of the Ransburg ditch.

After the filing of numerous motions and other matters the complaint was amended in 1965, adding parties and requesting additional damages. Also in that year the cause was venued to the Morgan Circuit Court.

Several other matters of significance should be noted at this point. In the 1960s construction of I-465 was completed immediately east of the properties involved. In connection with the construction of the highway, Ransburg allowed a contractor to excavate soil (borrow) in an amount sufficient to create a seven acre pond on the southern portion of the Ransburg property. The evidence most favorable to Ransburg is that he permitted this excavation, both to receive compensation for the borrow and to create the pond in order to alleviate flooding conditions on his property.

Finally, in 1966, in connection with the removal of the borrow, the southernmost portion of Pleasant Run Creek was moved to an artificial channel which ran north and south (for the most part) along the east property line of the Ransburg tract. This new channel ultimately connected with the ditch, dug by Glick, which entered the Ransburg tract some 300 feet south of the north line of the Ransburg property.

The matter was finally brought to trial June 10, 1974, and during the course of the proceedings, the present appellants were substituted for the original defendants below. The trial court found for Ransburg and Marion Construction Company, and awarded damages of $10,000.00 and $50,000.00 respectively. No injunctions were issued.

## I.

The first set of arguments concern the obligations of each party in handling surface water problems, and the right of each party to make use of an existing waterway.

Glick's initial argument in this regard is that an ordinance adopted by the Metropolitan Plan Commission in 1958 requires Ransburg to certify to the Commission that any planned development includes a drainage system adequate to handle storm water run-off from *developed* upper watershed areas. Thus, Glick contends that if Ransburg had developed his property first, he would still have had to provide drainage adequate to handle run-off *should* the upper watershed be later developed. Therefore, it is Glick's contention that he cannot be held liable for the cost of constructing a drainage system which Ransburg, should he have chosen to build, would have had to supply even if the upper watershed were completely *un*developed.

In response to this argument, Ransburg does not deny that he would have to comply with the ordinance. However, Ransburg contends that had Glick complied with the same ordinance, the cost of his compliance would be much less.

In addition, Ransburg argues that the ordinance does not state that one *must* develop his land. Thus, it is contended

that inasmuch as the area need not be developed at all, Glick cannot rely on the statute to compel Ransburg to provide a drainage system which is sufficient to handle drainage from the Glick areas.

The ordinance in question was approved by the Metropolitan Plan Commission on September 30, 1958, and adopted by the Marion County Council November 3, 1958.[2]

The particular section in dispute is as follows:

"d. *Open Ditch Drainage*
(1) plan for proposed system of drainage on a topographic base, spot elevations and grade on flow lines, elevation and details of all culverts, pipes, intersectional drains, drop inlets, bridge headwalls and similar or related necessary drainage installations.

\* \* \*

(4) certification by a registered professional engineer or registered land surveyor that all proposed drainage improvements and structures are adequately designed to safely handle surface drainage from upper watershed area when such upper watershed area shall have been developed for maximum land use permitted under the existing zoning classifications applicable to said area at the time of said certification."

In considering the effect of this ordinance upon the parties, we apply the same rules of construction as are used when a statute is involved. *Zorger v. The City of Greensburgh* (1877), 60 Ind. 1; *Woerner, etc. v. City of Indianapolis* (1961), 242 Ind. 253, 177 N.E.2d 34. Our duty in this regard is well summarized in the case of *State ex rel. Bynum v. LaPorte Superior Court No. 1* (1973), 259 Ind. 647, 291 N.E.2d 355, 356:

". . . None will dispute that in construing statutes, it is our duty to give effect to the plain and manifest meaning of the language used. This requires no citation of authority. In cases of ambiguity, we must search for legislative intent. If more than one construction is possible, the

2. There is no question raised concerning the power of the Commission to promulgate such an ordinance. See, IC 1971, 18-7-2-20, Ind. Ann. Stat. § 53-920 (Burns Supp. 1974).

court may consider the consequences of a particular construction. (Cases cited omitted.) A consideration of attendant evils may properly influence the construction in such cases; (cases cited omitted), and the court will endeavor to give the statute a practical application and to construe it in such a way as to oppose prejudice to public interest. (Cases cited omitted). These considerations are to enable us to determine the legislative intent. Once having determined such intent, however, the ambiguity disappears, and we are no more at liberty to adopt a construction that will not give effect to such intent than we would be had there been no ambiguity in the first instance. This, notwithstanding that we may not approve its purpose or that we perceive undesirable side effects apparently not envisioned at the time of passage." See also, *Woods* v. *State* (1957), 236 Ind. 423, 140 N.E.2d 752; *Roth* v. *Local Union No. 1460 of Retail Clerks Union* (1939), 216 Ind. 363, 369, 24 N.E.2d 280.

The above section from the subdivision regulations is but a small part of a comprehensive platting and zoning plan. It is also, as Glick suggests, an apparent departure from the common law principles regarding watercourses. Because of the nature of this particular regulation or requirement, we must reconcile it both with established case law and the subdivision regulations as a whole.

The case law of this state sets out well-defined principles which govern the options and obligations of adjacent landowners with regard to the drainage of surface waters. In *Smith et ux.* v. *Atkinson* (1962), 133 Ind. App. 430, 180 N.E.2d 542, the court adopted the following language from 29 I.L.E., Water, § 53:

"While the owner of upper or higher land may make such drains on his land as are required by good husbandry and the proper improvement of the surface of the ground, and such as may be discharged into natural channels without inflicting unnecessary injury on the adjacent owner, the right of the upper landowner to discharge surface water on the lower land is a right of flowage only in the natural ways and in natural quantities, and he may not alter the natural conditions so as to change the course of the water, or concentrate it at a particular point, or by artificial means increase its volume. Accordingly, an upper landowner may not, by a channel, sewer,

ditch, or drain, collect or concentrate the surface water and cast it on the lands of the lower proprietor, either intentionally or negligently, without incurring liability for the damages caused thereby."

We find helpful the further language from *Weddell* v. *Happner* (1890), 124 Ind. 315, 24 N.E. 368:

"While it is true that the owner of land may improve it either by changing the surface or by the erection of buildings or other structures thereon, so as to cause water accumulating thereon by rains and snows falling on the surface to stand in unusual quantities on other adjacent land, or pass into or over the same in greater quantities or in other directions than they were accustomed to flow, or may elevate or depress his land, thus changing the flow of surface water, as adjudged in the cases of *Taylor* v. *Fickas,* 64 Ind. 167, and *Weis* v. *City of Madison, supra,* it is also true that he can not by means of drains and ditches concentrate surface water and by that means carry it where it never flowed before and discharge it on to a lower land-owner to his damage, without becoming liable for the payment of such damage." See, also, *Templeton* v. *Voshloe* (1880), 72 Ind. 134; *Tichenor* v. *Witherspoon* (1927), 87 Ind. App. 79; *Weideroder* v. *Mace* (1916), 184 Ind. 242, 111 N.E. 5; *Gumz* v. *Bejes* (1975), 163 Ind. App. 55, 321 N.E.2d 851.

Applying the above principles to the case at bar we note the following salient facts: (1) the upper watershed drained through the Ransburg property before the land was purchased or developed by Glick; (2) the building of homes and streets tends to increase the *rate* of run-off, though not necessarily the quantity; (3) by a system of ditches and sewers, Glick collected the surface water from the upper area and channeled it toward the Ransburg property; (4) there apparently was no natural watercourse in existence at the northeast corner of the Ransburg tract at the point where the collected waters were vented from the Glick properties.

The above facts and law indicate that, although Glick could properly collect the normal quantities of water which fell on his lands and direct them to channels on his property, he could not direct the concentrated waters to a point where no natural watercourse existed, or

so increase the flowage as to cause damage to the lower Ransburg property.

With this in mind, we now turn to a consideration of the ordinance. The above section presents an immediate problem by the phrase ". . . safely *handle* surface drainage . . ." (our emphasis). While the entire sentence is clear that any plat must be able to "handle" or control water *"from"* an upper area, the section is silent as to what is to be done with the water after it is "handled" on any one plat, i.e., what about discharge of the water *from* any given area. Without more, this would certainly be a departure from the common law, since each developer could simply collect and control the waters as they pass through, and then discharge them on lower land without liability.

## DECISION

It is our opinion that § 2.06 (d) (1) (4), *supra,* does not relieve a developer from the duties traditionally imposed on an upper watershed landowner.

In reaching this decision we feel we have given the word "handle" its ordinary meaning.[3] To handle or "deal with" surface drainage should be construed as including the proper disposition of any water collected. This interpretation is supported by the platting regulations themselves. Chapter one sets out the general purposes and objectives of the regulations as ". . . unified county-wide planning and zoning . . ." We feel such an objective is furthered by requiring each developer to refrain from increasing the drainage burden on lower landowners. If each properly deals with the water on his land, then the natural flow of waters can be maintained without injury to the parties involved.

Further, section 2.02 (3) (G), in requiring an "area map" to be supplied with any application, states that any such map shall include:

---

3. See, Webster's Seventh New Collegiate Dictionary 376 (1965), where one definition of the word "handle" is ". . . to deal with, act on, or dispose of. . . ."

"A diagram of the proposed course of surface water drainage from the point *where water leaves the plat* to a court ditch, natural stream or public storm sewer, to be shown by flow lines, arrows and descriptive notes." (Our emphasis.)

Similarly, section 2.02(4)(c), which requires a topographical map be submitted with an application, states that such map shall include:

"Contours based on U.S. Coast and Geodetic Datum or U.S. Geological Survey Datum bench marks at one (1) foot vertical intervals, showing clearly by flow lines and arrows the drainage pattern of surface water, both natural and proposed, *within and through the area proposed to be platted,* the location and elevation of said bench marks to be shown thereon." (Our emphasis.)

These requirements demonstrate the Plan Commission's concern for the proposed *disposition* of water, and its effect on adjacent owners. This construction of section 2.06 is consistent with the broad scope of the entire regulation, and, although more than one interpretation is possible, we feel this construction ". . . oppose[s] prejudice to public interest." *State ex rel. Bynum, supra.*

Taking the facts most favorable to appellee Ransburg, in light of the above discussion, we conclude that Glick did collect the water which fell on or passed into his property, and direct it by means of artificial channels to a point where it was discharged in a concentrated flowage on Ransburg's land. This water was not discharged into a watercourse, at least not until the ditch was dug on the Ransburg tract. While we do not find that Glick is liable for any increase in quantity of discharge, or that the fact of discharge *per se* is improper, we do find that there is liability for any damage which may result from the *concentrated* discharge of waters upon land or into existing watercourses not previously subject to such discharge.

## II.

The second major argument by Glick is that he was entitled to make use of Pleasant Run Creek in draining his lands.

Glick emphasizes the immutable fact that prior to any development by him, the entire acreage involved drained onto Ransburg's property, eventually reaching the beginning of Pleasant Run Creek, some 525 feet south of the Glick-Ransburg property line. Glick maintains that since the water moved toward the creek before the development of the upper land, there can be no liability simply because the same water is now moved to the same place by artificial means.

As a further argument, Glick points out that in 1966 Ransburg had the channel of the creek altered and connected to the ditch dug by Glick which entered the Ransburg land. Glick maintains that since that time Ransburg cannot claim that the water from the upper area is not flowing in a natural watercourse.

In response to these arguments, Ransburg contends that any right to use the creek is one of *natural* flowage only, and that the moving of the creek bed was merely an attempt, in connection with the removal of the borrow, to deal with the "burden" created by Glick's drainage system.

## DECISION

There can be little dispute that landowners may make use of natural waterways to drain their lands. Indeed, one may construct ditches and channels on one's own land to more effectively carry surface water to an existing watercourse. Also, there exists in this appeal no controversy that water from the Glick properties has always drained toward Pleasant Run Creek.

Thus, it is clear that Glick had every right to allow water from his property to take its natural course onto the Ransburg land and eventually drain into the existing creek. The problem arises, however, when the water is collected and transported, by ditches, *directly* to the source of the creek.

There was evidence that in the course of natural flow toward the Ransburg land and Pleasant Run Creek, much of the water is absorbed into the ground. Further, there is, as

noted above, a marked increase in the *rate* of run-off for any plat of land when hard surfaces are placed thereon. Therefore, though the quantity of water may be the same (i.e., the same area is drained onto the Ransburg land), if by means of ditches the *rate* of discharge into an existing watercourse is increased, liability may fall upon the landowner so discharging the water. This principle is stated in *Templeton, supra,* at 136, as follows:

". . . the owner of the upper field may not construct drains or excavations so as to form new channels on to the lower field, nor can he collect the water of several channels and discharge it on the lower field so as to increase the *wash* upon the same. The right of the owner of the upper field to make drains on his own land is restricted to such as are required by good husbandry and the proper improvement of the surface of the ground, *and as may be discharged into natural channels, without inflicting palpable and unnecessary injury on the lower field.*" (Our emphasis.)

That the Glick lands naturally drained onto the Ransburg land does not give Glick the right to construct channels on his land and *on Ransburg's land* in order to discharge water in or near a natural watercourse in such volume as to cause damage to the lower owner.

We are aware of no decision that allows an upper landowner, without permission or consideration, to route all of his drainage onto another's land by digging ditches on the other's land to accommodate the flowage. One may not make use of a natural watercourse if damage is done to a lower landowner by reason of the routing of the water *to* the creek, or by reason of the increased flowage in the creek *after* the water arrives. *Templeton, supra; Cleveland, etc. R. Co.* v. *Griswold* (1912), 51 Ind. App. 497, 506, 97 N.E. 1030; *Walley* v. *Wiley* (1914), 56 Ind. App. 171, 104 N.E. 318.

We therefore conclude that while any landowner may use an existing watercourse to drain his property, under certain conditions, in the case at bar, there was no such watercourse

on the Glick property, and the means implemented to make use of Pleasant Run Creek were improper. It thus follows that any damage caused by the digging of the ditches and the channeling of the water through these to the creek should be compensated by the wrongdoer.

## III.

Having decided that Glick did in fact channel water onto the Ransburg land, and directly into the creek which traversed the latter's property, we must now consider Glick's arguments that the damages for such conduct are: (1) arbitrary, (2) unsupported by the evidence, and (3) excessive.

Glick argues first that the development of his land in no way impeded the development of Ransburg's property. Much emphasis is placed on the testimony of Ransburg's expert witness, who testified on cross-examination as follows:

"A. No, I don't think that whether or not the upstream watershed area is developed or undeveloped would make any difference on the solution to the drainage problem of this tract.

Q. In other words your testimony is that the solution that you've recommended would be the same whether or not the upstream areas were developed or undeveloped?

A. In this particular situation, yes, given the—giving the development potential of the upstream area."

It is asserted that this testimony conclusively shows that any development and drainage of the upper areas could cause no damages to the Ransburg property.

In this same vein, Glick contends that, given the above ordinance, any evidence on the costs of preventing flooding are costs necessary to comply with said ordinance, not costs which arise as a result of his conduct. Thus, Glick argues that even if Ransburg had developed before 1959 the costs would have been the same.

Further, Glick argues that there was no evidence of a reduction in value of the land; that the appraisals as to the present value of the land were improperly based on Ransburg

obtaining different zoning; that changed conditions on and near the Ransburg land have made a calculation of any damages attributable to Glick "impossible"; and that the damages for both the original trespass and other acts are arbitrary and excessive.

The above arguments are based wholly on evidence which the trial judge did not incorporate in his final findings of fact. The evidence which Glick urges can be summarized as follows:

(1) During trial there was no evidence that the lands have flooded since 1957.

(2) There was no evidence on the value of the Ransburg land as it is now zoned.

(3) Even taking the values given, the land, even that which is covered by the seven acre pond, has *appreciated* in value.

(4) Since 1959 Ransburg has allowed an additional 65 acres to drain into the creek.

(5) There was evidence that Road I-465 changed existing drainage systems and amounts of drainage.

(6) In 1966 Ransburg moved the channel of the creek to the east property line, adjacent to I-465.

Glick asserts that all of the above facts demonstrate the impropriety of the damages awarded.

Ransburg argues in reply that Glick was not in compliance with the above § 2.06 of the general ordinance; and that if Glick *had* complied by planning for proper discharge of water, the cost of complying with the ordinance would be less for lower owners.

Further, Ransburg contends Glick's development did stop his development of the lower property, and cites as support a letter from the Federal Housing Authority to the effect that a drainage problem was developing and no applications for mortgage insurance would be accepted until a plan to deal with the problem was submitted. (There was evidence that Ransburg had extensive dealings with the F.H.A. in the past.)

In addition to the above, Ransburg also argues that he cannot be forced to develop his lands, thus the provisions of the ordinance cannot compel him to submit to the requirements of the regulation. Alternatively, Ransburg contends that even if he does not develop, and regardless of the ordinance, the cost of dealing with the drainage problem would be the same. Second, Ransburg also contends that the proper measure of damages is the cost of remedial work, rather than the loss of the value of the land. Therefore, since there was evidence that increasing the size of the existing pond and performing other work would cost approximately $300,000.00, Ransburg argues the award of [a total] $60,000.00 was clearly proper.

In deciding the issue of damages, our task is twofold. First, we must determine if there was sufficient evidence to allow the trial court to determine the existence of compensable injury. Second, if there was injury shown, we must determine if the amounts awarded were excessive.

In addressing the first question, we are mindful that a party should be fairly compensated for any damage done. However, damages cannot be based on guesswork or speculation. *Moore* v. *Waitt* (1973), 157 Ind. App. 1, 298 N.E.2d 456; *Northern Indiana Steel Supply Co.* v. *Chrisman* (1965), 139 Ind. App. 27, 204 N.E.2d 668. Looking only at the evidence most favorable to Ransburg, we must decide whether there was sufficient evidence that the acts of Glick resulted in compensable injury.

It is our opinion that there was sufficient evidence to show that the acts of Glick resulted in damage to the Ransburg property.

We wish to emphasize that, in light of our construction of the ordinance involved, we do not feel any failure of compliance with the ordinance amounts *per se* to liability. Glick's plat plans were approved by the Commission, and Glick cannot be held to the requirements of our post-development interpretation of the applicable regulations.[4] Thus, whether or not

---

4. We do intend, however, that our construction of the subdivision regulation have immediate prospective application.

Glick complied with the regulation is not the end of the inquiry.

Though the evidence was in sharp conflict (some witnesses even contradicting themselves), we find the court could establish the existence of damages by reference to the following:

(1) Expert Franklin's testimony that the land was subject to flooding; that the elimination of the Glick drainage would lessen the problem; that plans for coping with the drainage problem would be different had there been no upstream development; and that an additional 14 acres of retention pond were necessary to control the situation.

(2) Evidence that the beginning of Pleasant Run was inside the Ransburg property, and that no natural ditches existed which led *to* the creek.

(3) Admission by Glick that the drainage system for his subdivisions connected directly into the ditch on Ransburg's property.

(4) Testimony that the rate of run-off was higher in developed areas, and water at said increased rate was channeled directly onto the lower land.

(5) Evidence that although the same *amount* of water may be involved, it moved toward the creek at a much slower rate prior to Glick's development.

(6) Testimony that Glick controlled all of his various businesses, and that a sub-contractor of one of these businesses dug the original ditch on Ransburg's land.

(7) The F.H.A. letter warning of flooding problems due to upstream development.

In deciding this question we have given considerable attention to the facts that the Ransburg land has not flooded since 1957. The evidence of past flooding, however, is not the crucial consideration. The damage consists of subjecting the lower property to an increased rate of flowage so that work must be performed before development of the downstream area may continue.

Having decided that damage was in fact done, we must now determine whether the monetary award was properly computed and proper in amount.

In reaching a conclusion on these questions we must, again, take the evidence most favorable to Ransburg, and must find that there were facts to uphold the computation and amount. *Bond* v. *Snyder Construction Co., Inc.* (1968), 142 Ind. App. 325, 234 N.E.2d 659. Generally, however, this court, in reviewing a claim of excessive damages, will not disturb an award of damages unless it is not within the scope of the evidence, or unless it appears that the award was motivated by prejudice, passion, or the consideration of improper evidence. *Levin* v. *Schuchman* (1971), 150 Ind. App. 254, 276 N.E.2d 208; *City of Evansville* v. *Rinehart* (1968), 142 Ind. App. 164, 233 N.E.2d 495; *Allison* v. *Boles* (1967), 141 Ind. App. 592, 230 N.E.2d 784.

In making the award the trial judge did not specify what measure of damages was used; rather, damages were awarded under the general statement that ". . . the law is with the plaintiffs . . ." Therefore, we find it necessary to examine the contentions of the parties to decide whether a proper measure of damages was used. If the arguments of Glick are correct, the wrong measure of damages was used, and the amount may be improper.

As noted above, Glick maintains alternatively that there was no loss of value to the land, and that any remedial action taken by Ransburg was not caused by conduct of Glick. Thus, Glick would avoid *all* damages, whether they be based on depreciation or cost of remedial work. The implicit emphasis of Glick's arguments, however, is on avoidance of damages based on the latter standard. This is so because Glick maintains that the land, all of it, has *increased* in value since the Glick activities. Thus, since there can be no damages here, Glick concentrates on arguing that any work done on the Ransburg land should not be charged to him.

Ransburg, although apparently willing to accept the award

as it stands,[5] maintains that the proper measure of damages is the cost of necessary remedial work. Thus, given the work estimates totalling about $300,000, Ransburg contends the award of $60,000 was well within the scope of reason and the evidence.

The case, noted by Ransburg, which extensively considers this problem is *General Outdoor Advertising Co., Inc.* v. *LaSalle Realty Corp.* (1967), 141 Ind. App. 247, 218 N.E.2d 141. In this case the appellant had leased the roof of a building and placed a large sign thereon. The appellee sued in contract and tort for damage done to the building. In discussing the issue of damages the court stated that:

> "We are concerned with rules of law which will control the measure of damages to be awarded to the appellee caused by the actionable wrong of the appellant, i.e., an amount necessary to compensate him for the damage sustained. In reviewing the Indiana authorities, we do not agree with the appellant's contention that the general rule for measuring damage to real estate is the market value of the property before the injury less the market value of the property after the injury. . . ."

In discussing prior cases, the court quoted from *The City of Fort Wayne* v. *Hamilton, et al.* (1892), 132 Ind. 487, 493, 32 N.E. 324, as follows:

> " 'The injury complained of in this case was permanent and destructive. The shrubs, shade trees and soil were removed therefrom and a street and sidewalk constructed, so that it was practically impossible to restore the property to its former condition. In addition to this, the rights of the public demanded its continuance as a public thoroughfare. This brings the case within the rule laid down in *Jones* v. *Gooday*, 8 M & W. 146, cited in *Anderson, etc. R.R. Co.* v. *Kernodle* 54 Ind. 314, fixing the measure of damages at the value of the land, rather than the amount which would be required to restore it to its original condition.' "[6]

After concluding that most injury to property which results from tortious conduct could be held to the same standard, the *LaSalle* court held that:

---

5. Ransburg has not argued that the award was inadequate.
6. The *Anderson* case, *supra*, may be of particular import, as it involved injury to real estate by reason of a trespass.

"What the courts have been stating is that if the injury to real estate is permanent, then the proper measure of damages is the market value before the injury less the market value after the injury. The cases have not interpreted the meaning of 'permanent.' However, on the authority of *Anderson, supra,* if the injury is not permanent, we know that the 'before and after' test is improper. See also *Indiana Pipe Line Co.* v. *Christensen* (1919), 188 Ind. 400, 123 N.E. 789. The *Anderson* case, *supra,* does not speak with much clarity on the exact measure to be used in the case of a non-permanent injury. But by way of dictum in *Fort Wayne, supra,* p. 493, the court speaks of the rule laid down in *Jones* v. *Gooday, supra,* cited by *Anderson, supra,* and interprets it as 'the amount which would be required to restore it to its original condition.' "

See, also, *Smith* v. *Glesing* (1969), 145 Ind. App. 11, 248 N.E.2d 366.

We are in agreement with the reasoning set forth immediately above. However, we must now decide whether the injury in the case at bar was permanent or non-permanent.

Clearly, the damage done to the Ransburg land is not of the type noted in *The City of Fort Wayne, supra.* The land remains useable. However, it is also true that the damages *are* permanent in the sense that water does and will continue to flow through the system of Glick ditches onto the Ransburg land.

## DECISION

After some consideration of the options before us,[7] we conclude that the injury to the real estate is, given the past and present facts of this case, not permanent. We reach this conclusion for several reasons. The nature of the wrongs consist of the digging of ditches and the removal of soil, and the concentration of drainage at a particular point on Ransburg's land. All of these injuries, we feel, can be corrected.

By this holding we have directed that the "before-after" test of damages is improper, but only as to this particular

---

7. See, generally, 25 C.J.S. Damages, §§ 84, 85; 22 Am. Jur. 2d Damages, §§ 131-135,

case. However, we must take careful note of what is required to adequately compensate Ransburg. The court, in *General, supra,* held that in cases of non-permanent injury, the cost of *restoration* is applicable. We must, therefore, determine the extent of the damage before we can determine if the award was proper in amount.

Throughout this opinion, we have carefully noted that Ransburg's complaint is that the water from Glick's property was brought by "concentrated flowage" to various points. Thus, the injury, aside from the ditches themselves, is that Ransburg's land will or may flood because of the increased rate of water funneled into Pleasant Run Creek. This much was testified to by various witnesses for Ransburg. We conclude, therefore, that what must be "restored" is (1) the general topography of Ransburg's land which was disturbed by Glick's activities, and (2) the volume of water into Pleasant Run Creek.

We feel this result is consonant with the facts of this case and the principle of full compensation *for the damage done.* The expert evidence was that Glick's development was a "burden" on Ransburg's land, and that the land was "subject to flooding." Further, Ransburg testified that he had not continued to develop his land because of Glick's conduct. Therefore, if the problem created or aggravated by Glick is remedied, Ransburg should be free to develop his land as he plans.

Our final consideration is whether the *amount* of damages is proper. As noted, we have no insight as to the foundation for the $60,000 award. This in itself is not fatal, since a judge is vested with wide discretion in this respect. *Smith, supra.*

Further, in considering the amount of damages, we note that although there was conflicting testimony in this regard, it is not our duty to weigh the evidence, nor judge the credibility of the witnesses. As was stated in *Allison v. Boles, supra,* at page 597:

"The rule is well established in this state that where the reasonable amount of recovery is in dispute under the

evidence, the amount awarded cannot be considered excessive if it is within the scope of the evidence before the court. *First Bank & Trust Company of South Bend, Executor of the Estate of Spiro* v. *Tellson* (1954), 124 Ind. App. 478, 484, 118 N.E.2d 496."

Further, in judging the award of $60,000, we do not require any particular degree of mathematical certainty, *Myers* v. *Maris* (1975), 164 Ind. App. 34, 326 N.E.2d 577, 584, and where there is doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer. *City of Fort Wayne* v. *Capehart-Farnsworth Corp.* (1957), 127 Ind. App. 412, 424, 142 N.E. 2d 442.

We find the award of damages supported by the record. The evidence discloses that an expenditure of $304,000 would remedy the problem created by Glick; and that such would also benefit the land owned by Ransburg. Thus, the trial judge, by giving Glick credit for the benefit, could have reached an award of $60,000 and divided the same between Ransburg and Marion Construction Corporation.

Given the ample evidence on the nature of the remedial work, and the cost therefor, we conclude the award of $60,000 was well within the scope of the evidence.

The judgment of the trial court is hereby affirmed.

Robertson, C.J. and Hoffman, J. concur.

NOTE.—Reported at 330 N.E.2d 26.

ON PETITION FOR REHEARING

LOWDERMILK, J.—We deem it necessary to comment briefly on appellant Glick's petition for rehearing.

In his petition, Glick contends that our construction of the ordinance involved is incorrect because the lower landowner won't "ever have to worry about any increased flowage from maximum land use because each upstream developer will have to take care of his own surface water drainage problems within the confines of his own land. *This just is not what the Ordinance says.*" (Glick's emphasis.)

Glick misinterprets our holding. We did not hold that upper landowners are responsible for the drainage of lower lands. What we held was that Ordinance 58-AO-13, § 2.06 (d) (1) (4) did not permit an upper landowner to develop his land in complete disregard for the discharge of water from his land. The ordinance is not a shield for the unscrupulous and unmindful development of urban properties.

We reiterate that each upper landowner's duty *under the ordinance* as interpreted is to develop plans that provide for the proper "handl[ing]" of drainage water—and this includes plans for the proper *discharge* of water from the developed plat.

The lower landowner must still deal with the water while on his property *and* as it passes *from* his property. It is important to note that the lower landowner's development of his own property will increase the drainage problems for the landowner yet below him. To allow each higher landowner to increase the problem and simply pass it on so that a few on the lower end must bear the ultimate burden cannot be the purpose of the ordinance here involved.

Other questions raised essentially ask us to reconsider the evidence in support of our judgment. The evidence considered with regard to our original opinion was, of course, that most favorable to appellee Ransburg. That Glick asserts testimony that could support his position cannot alter

our conclusions where other evidence of probative value upholds Ransburg's contentions.

Petition for rehearing denied.

NOTE.—Reported at 333 N.E.2d 140.