# FOR PUBLICATION



FILED
Aug 29 2013, 5:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. AUGER**
Franklin, Indiana

ATTORNEY FOR APPELLEE:

**JAMES T. ROBERTS**
James T. Roberts, PC
Nashville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

RUTH SHEEK,                                )
                                           )
    Appellant/Appellee,                )
                                           )
             vs.                        )    No. 07A01-1211-PL-509
                                           )
MARK A. MORIN LOGGING, INC.,               )
                                           )
    Appellee/Appellant.                )

APPEAL FROM THE BROWN CIRCUIT COURT
The Honorable Judith A. Stewart, Judge
Cause No. 07C01-1004-PL-225

**August 29, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Ruth Sheek, who owned fifty-three wooded acres in Brown County, Indiana, entered into a contract with a logging company to have specific trees cut down. When Ruth realized the severity of the damage being done to her property during the timber-harvest process, she stopped the entire operation. The logging company performed some remediation work, but damage to Ruth's property still remained. Ruth sued for breach of contract, and the logging company counterclaimed for breach of contract. The trial court awarded Ruth $55,572.50 in damages.

Ruth appeals arguing that the trial court used the wrong measure of damages for the injury to her real property and that the court erred by reducing her damages by the value of the unharvested trees the loggers left on her property. Because the record shows that the damage to Ruth's property is temporary rather than permanent, the trial court properly used the cost of repair, and not the difference between the market value before and after the injury, to calculate the damages. We also conclude that, because Ruth was paid for all the trees and the loggers left behind $4000 in unharvested trees, the trial court properly reduced Ruth's damages by $4000 to avoid a windfall. We therefore affirm the trial court.

**Facts and Procedural History[1]**

Ruth owns approximately fifty-three wooded acres on Gatesville Road in Brown County, Indiana. She purchased the property in 1966. The property has a small cabin

---

[1] Ruth presented the facts of this case witness by witness. Indiana Appellate Rule 46(A)(6)(c) provides that the Statement of Facts "shall be in narrative form and shall not be a witness by witness summary of the testimony."

with a stone path leading to a 2.5-acre lake. The cabin is a second home for Ruth, who lives in Greenwood.

In June 2009, an agent for Bedford, Indiana-based Mark A. Morin Logging, Inc. ("Morin Logging") stopped by the cabin to see if Ruth was interested in selling her timber. Ruth's timber had been harvested approximately fifteen years earlier. After some discussion, on June 27, 2009, Ruth and Morin Logging entered into a written contract entitled "Sale of Standing Timber." Pl.'s Ex. 8, p. 1. According to the contract, Ruth agreed to sell all trees "18 diameter inches and larger at the stump" on her fifty-three-acre tract to Morin Logging. *Id.* The contract also called for any trees within thirty feet of the lake to be cut and pulled back and for Morin Logging to "level skid roads [and] loading area." *Id.* at 3. The contract, which was in effect from June 27, 2009, to July 1, 2010, provided that the timber harvest would be done in a "workmanship like manner without undue disturbance or residual damage to the premises." *Id.* at 1, 2. However, the contract also warned that "the timber harvest process involves the use of men, tools, and equipment upon the premises and incidental forest growth[,] and residual damage occurs." *Id.* at 2.

The contract price was $21,000. Morin Logging paid $1000 down. Morin Logging used Hamilton Logging, Inc., from Martinsville, Indiana, as a subcontractor to harvest Ruth's timber.[2] Hamilton Logging began to harvest the timber in December 2009, at which point Ruth was paid the remaining $20,000.

---

[2] Mark Morin from Morin Logging and Robert Hamilton from Hamilton Logging are first cousins.

The timber-harvest process requires the use of heavy equipment called skidders. Hamilton Logging used the loading area and skid roads that were present on Ruth's property from the previous logging operation to avoid additional damage. However, Hamilton Logging expanded the loading area and skid roads and added twenty tons of stone to the loading area, even though this was not specifically addressed in the contract. Tr. p. 237.

When Hamilton Logging began logging Ruth's property in December 2009, the ground was frozen. However, the weather warmed up in mid-December and the ground quickly thawed, causing the skidders to sink. The logging was approximately two-thirds finished at the time. Hamilton Logging continued operations because they "thought [they] could get it done," *id.* at 205, but doing so caused deep ruts in the skid trails. Some ruts were three feet deep and three feet wide.

At about the same time, one of Ruth's Brown County neighbors called her in Greenwood and advised her to check on her property. Ruth immediately went to her Brown County property where she discovered a "huge" staging area with "a whole bunch of rocks," huge ruts, damaged standing trees, and discarded tree tops and tree trunks piled up with dirt or mud. *Id.* at 142. Ruth, who was very upset, approached the loggers and told them to leave. Ruth also took pictures and went to the Brown County sheriff and prosecutor in an effort to stop the logging, but she was unsuccessful. On December 18, Ruth's attorney sent Morin Logging a "cease and desist" letter. Def.'s Ex. 13. According to Ruth, the logging did not stop until sometime in February 2010. When the

loggers finally left Ruth's property, there were numerous trees that remained to be cut pursuant to the contract with a value of $4000.

Remediation measures were required to repair the extensive damage to Ruth's property. Ruth gave Hamilton Logging permission to reenter her property to remediate the damage. Hamilton Logging hired a forester to advise them on what should be done. In November 2010, Hamilton Logging brought in a bulldozer to fill and level the rutted areas, installed water bars to prevent further erosion from the skid trails, and hired a landscape company to seed and straw the graded areas. Hamilton Logging spent $20,427.50 in remediation. Def.'s Ex. 17.

Before Hamilton Logging completed this remediation work, Ruth hired forest consultant Don Duncan in March 2010 to inspect her property. According to Duncan, the harvesting of Ruth's timber occurred at the worst time of the year—generally November and December when the ground is wet but not yet frozen. Duncan, who took numerous photographs that were admitted into evidence at trial, was "very surprised at the visual damage done on [Ruth's] woodland." *Id.* at 18. Duncan explained that timber operations always produce rutting, but what occurred on Ruth's property was "extreme." *Id.* at 25. Duncan explicated that "the hidden effect of logging in the mud is the removal of air pockets in the soil, and root mortality, resulting in very compacted conditions and future tree mortality during the hot summer months." Pl.'s Ex. 85. Duncan also observed skid damage to the pond emergency spillway which could compromise the dam, ruts leading to the pond which would result in sedimentation and shortened pond life, and the ruts themselves which would result in permanent stagnant water, increased mosquitos, major

5

aesthetic disturbance, the inability to enjoy the property, and tree mortality. *Id.* Duncan concluded that contrary to the contract between Ruth and Morin Logging, the work was done with both "undue disturbance" and "residual damage" to Ruth's property. *Id.* According to Duncan, it would take 40 to 100 years for Ruth's woods to regenerate. Tr. p. 62-63.

Duncan inspected Ruth's property again after Hamilton Logging completed the remediation work and noted a "huge improvement" from the "very deep ruts closed in and water-bars installed." *Id.* at 54; Pl.'s Ex. 86. However, Duncan observed that the following problems remained:

(1) According to the Indiana Department of Natural Resources Best Management Guidelines, additional water bars were needed to meet minimum specifications on the steeper slopes.

(2) The bull dozer did not rake in the "curb" along the skid trails caused by the dozer blade, which prevented water from flowing off the skid trails and resulted in ponding and erosion.

(3) The major skid trail removed an excess of soil, resulting in "bowling alleys," which had become a permanent part of the landscape.

(4) The remediation did not include restoring the stone path to the lake. The contract required Morin Logging to pull back cut trees within thirty feet of the lake, which was not done. Instead, the trees piled up in the lake-view area, making pond access from the cabin "virtually impossible."

6

Pl.'s Ex. 86. According to Duncan, these problems could have been fixed during the remediation. Tr. p. 54-55.

In March 2010, Ruth hired a certified real-estate appraiser, Charles Greller, who said that the value of Ruth's property before the logging was $300,000. *Id.* at 96. However, he said that after the logging—but before Hamilton Logging's remediation—the value of Ruth's property was $150,000. Pl.'s Ex. 87. He arrived at $150,000 by subtracting the estimated costs of remediation—$75,000—plus an equal reduction for the "stigma" to a buyer of a damaged or distressed property. Tr. p. 96. Greller could not find comparable properties because "traditionally property that ha[s] been heavily timbered is not sold afterwards. So, the comparable sales are extremely limited, and in some cases, non-existent." *Id.* at 91-92. Notably, Greller did not reappraise Ruth's property after Hamilton Logging's remediation work. Ruth, on the other hand, believed that her property was worth $500,000 before the logging but only $100,000 afterwards.

In April 2010, Ruth filed a complaint for breach of contract against Morin Logging. Ruth alleged that Morin Logging caused "undue disturbance and residual damage to [her] Real Estate, in breach of the Contract."[3] Appellant's App. p. 9. For example, Ruth alleged that Morin Logging caused extreme rutting, skid damage to the pond emergency spillway, ruts leading to the pond, root damage to the trees, and disturbance to the soil. Ruth alleged that as a result of Morin Logging's actions, she "has suffered diminution of the value of the Real Estate as well as the costs to repair and restore the Real Estate to its prior condition." *Id.* Morin Logging responded with a

---

[3] Notably, Ruth did not allege that Morin Logging breached the contract by removing trees that were smaller than 18 inches in diameter at the stump.

7

counterclaim for breach of contract. Morin Logging alleged that on or about December 18, 2009, Ruth breached the contract by denying Morin Logging and its agents and employees access to the harvest area, and at the time of the denial of access, "more than 200 trees remain[ed] to be harvested pursuant to the contract . . . ." *Id.* at 14.

A bench trial was held in July 2012.[4] In October 2012, the trial court issued extensive findings of fact and conclusions of law.[5] The relevant ones follow:

> 27. Although [Ruth] testified that the difference in the value of her property before and after the damage from the Morin logging was $400,000.00 ($500,000 prior to the damage and $100,000 after), the court finds the values of the property and damage done to be more in line with the testimony of Mr. Greller.
>
> 28. The value of [Ruth's] property has been diminished by unremediated damage done by Morin.
>
> 29. However, the court finds that the market value of the property also was adversely affected by the significant degree of timbering permitted under the terms of the contract agreed to by [Ruth]. A contract that allowed for the removal of all trees 18" in diameter "at the stump," whether measured at the ground or a few feet higher, allowed for the removal of a lot of trees. As Mr. Greller testified, it was difficult to even find a comparable property for valuation purposes because property that has been recently timbered, especially to this degree, is usually not offered for immediate sale. A very large part of the changed aesthetics of the property is the openness of the woodland due to the intensity of the cut and number of trees taken, a result permitted by the terms of the contract. Moreover, some of the complaints raised by [Ruth], such as the unsightly appearance of the tops and branches left behind, will exist after any logging operation and are in accordance with best practices, though the unsightliness is compounded if the tops are placed in piles.

---

[4] An August 7, 2012, CCS entry provides that the parties were to meet at the courthouse for an on-site visit, but the CCS does not state whether the visit occurred. Appellant's App. p. 6; *see also* Tr. p. 305 (trial court discussing with counsel at the end of the bench trial that it would be helpful to see the property).

[5] We would like to thank the trial court for its helpful and clear findings in this factually involved case.

8

\* \* \* \* \*

2. Morin breached the contract by failing to perform the logging in a workman like manner without undue disturbance or residual damage to the premises. Specifically, Morin logged [Ruth's] property in soil conditions that were too wet, causing extreme ruts and unnecessarily compacted soils, scarring the land with parallel and excessive skid trails, failing to create all necessary water bars, and causing undue disturbance to and damage to [Ruth's] property. Morin further breached the Contract by failing to pull back trees from the lake area and by damaging the stone pathway to the lake.

\* \* \* \* \*

5. A party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract. Because [Morin] first breached the contract by logging in soil conditions that were too wet causing extensive damage to [Ruth's] property, Morin cannot recover on its counterclaim for subsequent breach of the contract by [Ruth].

6. The measure of damages for permanent injury to real estate is the difference between the market value before and after the injury. The measure of damages for non-permanent damage to real property is the amount which would be required to restore it to its original condition.

7. Whether the damage occasioned by Morin's breach of contract is temporary or permanent is not altogether clear cut. The evidence established that on average, a wooded tract can be re-entered for timbering every 15-20 years depending on how many trees are cut. Due to the intensity of the logging on [Ruth's] property, however, the evidence established it could take 40-100 years to restore the woods. Thus, while the woods could eventually be restored, such restoration would require a time frame that could extend well beyond [Ruth's] lifetime. However, it was terms of the contract itself that allowed for such a significant removal of trees, not Morin's breach.

8. The court finds that the damages that resulted from Morin's breach are non-permanent and can be remediated.

9. The court finds the appropriate damages in this case to be the total cost of remediation less the cost of remediation already performed by Morin and less the value of the remaining trees in excess of 18" in diameter that could have been harvested by Morin under the contract.

9

10. The evidence of the total cost of remediation from Mr. Greller, not including repairing the path to the lake, was $75,000.00. The evidence was only an estimate and was not based on actual bids or estimates from contractors. It was, however, based on years of experience with real estate in Brown County. When there is doubt as to the exact proof of damages, the uncertainty must be resolved against the wrongdoer.

11. The court finds the amount of damages caused by Morin's breach to be $55.572.50, calculated as follows: Total remediation costs of $75,000: plus $5,000 for damages to restore the path to the lake and pull back the trees from the lake; less $20,427.50 in remediation costs already performed by Morin; less $4,000.00 in trees Morin could have harvested under the contract.

*Id.* at 20-22 (citations omitted). Ruth appeals, and Morin Logging cross-appeals.

## Discussion and Decision

Ruth raises two issues on appeal. First, she contends that the trial court used the wrong measure of damages for the injury to her real property; she argues that because the injury to her property is permanent rather than temporary, the proper measure of damages is the difference between the market value before and after the injury. Second, she contends that the trial court erred in reducing her damages by the value of the unharvested trees the loggers left on her property.

Morin Logging cross-appeals, arguing that the trial court erred in using Greller's $75,000 remediation estimate as the starting point for damages in this case.

Both parties challenge damages. Our review of a damages award is limited. *Four Seasons Mfg. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007). We do not reweigh the evidence or judge the credibility of witnesses, and we will reverse an award only when it is not within the scope of the evidence before the finder of fact. *Id.* A factfinder may not award damages on the mere basis of conjecture and speculation.

10

*Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009). Instead, the award must be supported by probative evidence. *Four Seasons*, 870 N.E.2d at 507.

Where, as here, a trial court has entered findings of fact and conclusions thereon pursuant to a party's request, we engage in the following two-tiered standard of review. We must first determine whether the evidence supports the findings of fact and then whether the findings support the judgment. *Gates v. Houston*, 897 N.E.2d 532, 534 (Ind. Ct. App. 2008). We will not reverse the trial court's findings and judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences from the evidence to support them. *Id.* The judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. *Id.* at 534-35. In making these determinations, we will neither reweigh the evidence nor judge witness credibility, considering only the evidence favorable to the judgment and all reasonable inferences therefrom. *Id.* at 535. While we defer substantially to findings of fact, we do not do so for conclusions of law. *Id.* We apply a de novo standard of review to conclusions of law and owe no deference to the trial court's determination of such questions. *Id.*

## I. Ruth's Appeal

### A. Measure of Damages

Ruth contends that the trial court used the wrong measure of damages. The measure of damages in a case of injury to real property depends on whether the injury is permanent or temporary. *Terra-Products, Inc. v. Kraft Gen. Foods, Inc.*, 653 N.E.2d 89,

91 (Ind. Ct. App. 1995), *trans. denied.* Permanent injury to unimproved land occurs where the cost of restoration exceeds the market value before the injury. *Id.* If the injury is permanent, the measure of damages is limited to the difference between the fair market value of the property before and after the injury, based on the rationale that "economic waste" results when restoration costs exceed the economic benefit. *Id.*; *Gene B. Glick Co. v. Marion Const. Corp.*, 165 Ind. App. 72, 331 N.E.2d 26, 37 (1975), *reh'g denied.* But if the injury is temporary, the proper measure of damages is the cost of repair. *Terra-Products*, 653 N.E.2d at 92; *City of Anderson v. Salling Concrete Corp.*, 411 N.E.2d 728, 734 (Ind. Ct. App. 1980); *Glick Co.*, 331 N.E.2d at 37.

Here, there is no evidence that the remediation costs exceed the market value of Ruth's property before the injury. Therefore, according to law, the injury to Ruth's property was not permanent. Furthermore, the trial court found in fact that the injury to Ruth's property was temporary and could be remediated. Appellant's App. p. 22 (Conclusion No. 8). The trial court explained that while determining whether the injury to Ruth's property was temporary or permanent was not "clear cut," "it was the terms of the contract itself that allowed for such a significant removal of trees, not Morin's breach." *Id.* That is, Ruth entered into a contract in which she agreed to sell all trees "18 diameter inches and larger at the stump" on her fifty-three-acre tract to Morin Logging. And although it would take at least forty years to restore Ruth's woods (as opposed to the usual fifteen or twenty), that was because of the number of trees removed, not the damage done to her property during the timber-harvest process. For the damage done to Ruth's property during the harvest, such as the extreme rutting, excessive skid trails, the

trees left near the lake, and the removal of the stone path to the lake, the trial court concluded that this damage was temporary and could be remediated. *Id.* Despite Ruth's argument that evidence was presented that her property could not be further remediated because it would only further damage her property, she is simply asking us to reweigh the evidence, which we will not do.[6] The trial court's finding that the damage to Ruth's property was temporary and remediable is supported by the evidence, including Ruth's own witness, Duncan, who outlined additional work that could be done to Ruth's property, including installing additional water bars, pulling back trees by the lake, and restoring the stone path to the lake. The trial court used the proper measure of damages.[7]

Nevertheless, Ruth cites environmental-contamination cases, where this Court has held that the traditional distinction between temporary and permanent injury is ill-suited for determining damages, and asserts that this case falls neatly under that category. *See Terra-Products*, 653 N.E.2d at 92-93. In those cases, we held that a "hybrid" approach, which utilizes both the cost of repair and any reduction in the property's value after repair, applies when there is environmental damage, such as polychlorinated biphenyls (PCB) contamination, to real property. *Id.* at 93. That is, if the plaintiff can demonstrate that repairs to real property fail to restore the land to its former value, recovery of

---

[6] For example, Ruth says that Robert Hamilton from Hamilton Logging testified that her property could not be further remediated. Robert actually testified that he would not recommend going back and doing any additional earth moving or remediation because in his opinion her property "look[ed] pretty good." Tr. p. 229. When asked what additional remediation would cost, Robert said he did not know because Ruth's property had already been "vegetated" and the ruts had already been "leveled." *Id.* When asked if additional work would cause "more possible erosion or damage," Robert said yes. *Id.*

[7] In any case, the award Ruth seeks would put her in a better position than she was in before the timber was harvested from her property. Ruth entered into a contract to sell the timber on her property and received $21,000 for it. She cannot be awarded damages based on the pre-timbered value of her property *and* keep the payment for the standing-timber contract.

damages for the property's reduction in value is the only measure of damages which will fully compensate the landowner for his loss. More specifically, in the context of environmental contamination of land, a party should be entitled to recover as damages any proven reduction in the fair market value of real property remaining after remediation, i.e., the remaining loss damages. *Id.*

Here, the trial court found that the remediation to Ruth's property would restore it to its market value after the trees were removed but before the damage. Ruth had the burden of proving otherwise but did not do so. *See id.* at 94 ("Nevertheless, Terra has not met its burden of designating evidence which would tend to establish that Kraft's remediation did 'not restore the value [of Terra Site] to its prior level' or 'to its fair market value before the causative event.'"). Therefore, the hybrid approach does not apply here.

### B. Calculation of Damages

Ruth next contends that the trial court erred by reducing her damages by $4000, which is the value of the unharvested trees covered by the contract that the loggers left on her property. Morin Logging responds that the trial court properly reduced Ruth's damages by $4000, because if Ruth were allowed to keep the value of the unharvested trees in addition to the $21,000 she already received pursuant to the contract, she would receive a "windfall." Appellee's Br. p. 12.

It is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered. *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). That is, a

14

party injured by a breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred. *Id.* In addition, the law disfavors a windfall or a double recovery. *See INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. Ct. App. 2003), *trans. denied*.

The evidence shows that Ruth ended the contract early when she realized the extent of the damage the loggers were causing to her property. At the time, Ruth had been paid in full for the timber, $21,000, but all the timber had not been harvested or removed from her property. If Ruth kept the unharvested trees without subtracting their value from the total amount awarded to her, she would be placed in a better position than she would have been if the breach had never occurred. This is because Morin Logging paid for trees they never received. Thus, the trial court properly reduced Ruth's damages by $4000.[8]

## II. Morin Logging's Cross-Appeal

Morin Logging cross-appeals, arguing that the trial court erred in using Greller's $75,000 remediation estimate as the starting point for damages in this case because his estimate "did not account for the degree to which Morin's remediation improved [Ruth's] property . . . ." Appellee's Br. p. 7.

Certified real-estate appraiser Greller said it would cost $75,000 to remediate Ruth's property, but he made this estimate before Hamilton Logging remediated Ruth's

---

[8] Ruth argues that because Morin Logging was the first party to breach the contract, Morin Logging is not entitled to recover on its counterclaim against her for ejectment. *See, e.g.*, *Illiana Surgery & Med. Ctr., LLC v. STG Funding, Inc.*, 824 N.E.2d 388, 403 (Ind. Ct. App. 2005) ("A party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." (quotation omitted)). The $4000 is not damages for the counterclaim the trial court rejected. The $4000 is merely a setoff so that Ruth did not receive a windfall.

property. The record shows that Hamilton Logging spent $20,427.50 to remediate Ruth's property. Forester Duncan testified that although Ruth's property looked better after the remediation, additional problems remained. Duncan then outlined some corrections that could be made, including installing additional water bars, removing the trees from the lake, and restoring the stone path to the lake. Based on this evidence, the trial court concluded:

> 10. The evidence of the total cost of remediation from Mr. Greller, not including repairing the path to the lake, was $75,000.00. The evidence was only an estimate and was not based on actual bids or estimates from contractors. It was, however, based on years of experience with real estate in Brown County. When there is doubt as to the exact proof of damages, the uncertainty must be resolved against the wrongdoer.

> 11. The court finds the amount of damages caused by Morin's breach to be $55.572.50, calculated as follows: Total remediation costs of $75,000: plus $5,000 for damages to restore the path to the lake and pull back the trees from the lake; less $20,427.50 in remediation costs already performed by Morin; less $4,000.00 in trees Morin could have harvested under the contract.

Appellant's App. p. 22.

We find that the trial court properly used Greller's $75,000 estimate as a starting point to determine the damages in this case. We initially note that Morin Logging does not challenge Greller's authority to offer a remediation estimate in this case. Because the evidence shows that damages still remained to Ruth's property after Hamilton Logging's remediation work, it was reasonable for the trial court to subtract the amount that Hamilton Logging spent on remediation from the $75,000 estimate to determine the amount that Morin Logging still owed. Morin Logging's arguments that the remediation work could have improved Ruth's property more than $20,427.50 if Greller had provided

a second estimate *after* the remediation work is merely speculation and more a product of the fact that Morin Logging did not present the trial court with its own estimate to contradict Greller's. The trial court's damage award is supported by the evidence.

Affirmed.

BAKER, J., and FRIEDLANDER, J., concur.